**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| RICHARDSON INDEPENDENT SCHOOL DISTRICT, | § § § | |
| Plaintiff, | § § | |
| v. | § § | No. 3:05-CV-535-M |
| MICHAEL Z. and CAROLYN Z., as next friends of LEAH Z., a minor child, | § § § | |
| Defendants. | § § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are Defendants' Motion for Judgment on the Record, Plaintiff's Motion for Final Judgment, Plaintiff's Motion to Strike the Appendix to Defendants' Motion, and Plaintiff's Motion to Strike Defendants' Brief in Support of Defendants' Response. Although Defendants' Response to Plaintiff's Motion for Final Judgment exceeds the page limit prescribed by the Local Civil Rules, the issues in this case are legally and factually complex, and Plaintiff and Defendants were both granted leave to file additional briefing. The Motion to Strike Defendants' Brief in Support of Defendants' Response is therefore **DENIED**. For the reasons stated below, Plaintiff's Motion to Strike the Appendix to Defendants' Motion is also **DENIED**, Plaintiff's Motion for Final Judgment is **DENIED**, and Defendants' Motion for Judgment on the Record is **GRANTED IN PART**. Additionally, the parties are advised that additional briefing is required and is described in the body of this Memorandum Opinion and Order.

# THE IDEA

The Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400–1482 ("IDEA"), attempts "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). States receiving federal assistance under the IDEA are obligated to (1) provide a "free appropriate public education" to each disabled child within its boundaries, and (2) ensure that such education is in the "least restrictive environment" possible. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997); 20 U.S.C. § 1412(1), (5). The free appropriate public education provided must be developed to each disabled child's needs through an "individual educational program" ("IEP"), "a written statement prepared at a meeting attended by a qualified representative of the school district, a teacher, the child's parents or guardians, and, when appropriate, the child." *Michael F.*, 118 F.3d at 247; *see* 20 U.S.C. § 1414(d). In Texas, the committee responsible for preparing an IEP is known as an Admissions, Review, and Dismissal Committee ("ARD Committee").[1]

The IDEA also establishes robust procedural requirements that bind state and local educational agencies receiving federal assistance. 20 U.S.C. § 1415(a). In relevant part, the IDEA permits a parent or guardian of a disabled child to file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6). The complaint initiates an impartial due process hearing, conducted in accordance with state law. 20

---

[1] The IDEA refers to such a committee as an IEP Team. 20 U.S.C. § 1414(d)(1)(B).

U.S.C. § 1415(f)(1)(A).  In Texas, a Special Education Hearing Officer ("Hearing Officer")

presides over such a hearing.  If the hearing is conducted by a local educational agency, any party

aggrieved by the agency's decision may appeal to a state educational agency.  20 U.S.C.

§ 1415(g).  Thereafter, any aggrieved party "shall have the right to bring a civil action . . . , which

action may be brought in any State court of competent jurisdiction or in a district court of the

United States, without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).

## BACKGROUND

This case concerns the education of Leah Z., a minor child at all relevant times, and the

steps taken by the Richardson Independent School District ("District") to provide Leah a free

appropriate public education as required by the Individuals with Disabilities Education Act.  The

Court shall refer to Leah by her first name and to her parents—Michael Z. and Carolyn Z.—as

Defendants.  The record in this case, which the Court has reviewed in determining whether to

uphold or reverse the administrative decision below, is substantial.  Suffice it to say that the

Court here aims only to present the contours of the relevant facts.

Since a very young age, Leah has had behavioral problems.  She was diagnosed with

attention deficit disorder and oppositional defiant disorder at age four, and with bipolar disorder

at age six.  Prior to attending school in the District, Leah attended nearly a dozen private schools,

ranging from daycare centers, to day schools, to special needs institutions.  She experienced

emotional and behavioral difficultly in most of these schools.  She first entered the District

during the fall of 1999, for the fifth grade.  By the time Leah reached the ninth grade—the year

most relevant to this action—she had been diagnosed with bipolar disorder, separation anxiety

disorder, oppositional defiant disorder, attention deficit hyperactivity disorder, and pervasive

developmental disorder.  Based on these diagnoses, Leah qualified for special education and related services from the District.

Leah exhibited some academic progress, albeit measured, in her fifth-, sixth-, seventh-, and eighth-grade years.  At the end of sixth grade, in May 2001, the District administered to Leah, for the first time, the Texas State Developed Alternative Assessment ("SDAA").[2]  The test revealed that Leah could read at the level of a minimally proficient fourth-grade student, and could perform math at the level of a moderately proficient fourth-grade student.  At the end of eighth grade, in May 2003, Leah's reading and math levels were assessed at those of a sufficiently proficient fourth-grade student.  Defendants note that it was reported at an ARD Committee meeting in October 2002 that Leah was writing at a second- to third-grade level, reading at a third-grade level, and performing math at a sixth-grade level.

In seventh grade, Leah entered Westwood Junior High School ("Westwood"), a school within the District.  She was placed in a Behavior Adjustment ("BA") course, and by the middle of that year, Leah was alone in the class with her teacher, Claire Burton.  She remained in the class until the fall of her ninth-grade year, having initially developed a good relationship with Burton.

*A. Leah's Ninth-Grade Year*

On September 25, 2003, at the beginning of Leah's ninth-grade year, an ARD Committee met to establish her IEP, which included the goals of increasing her reading skills in

---

[2] The SDAA is a special education alternative to the standardized test administered to "mainstream" students.  As is apparent from a review of Leah's SDAA results, the test assesses students relative to mainstream grade levels, with three gradations of proficiency: minimal, moderate, and sufficient.

comprehension "to a high [third-grade] level,"[3] and of improving her math skills to a fifth-grade level. The IEP also noted that Leah had "regressed significantly over the summer," and had not "recouped." It additionally provided strategies to promote progress for Leah, including the use of "frequent breaks and reward times," but placed certain limitations on time outside the classroom. Most relevant to this proceeding, the IEP contemplated that school staff "supervise Leah at all times and . . . require that she stay in the classroom unless she has permission to leave it. This may mean that staff [will be required to] keep the classroom door closed and use physical proximity to keep Leah from departing without permission."

Leah began experiencing academic and behavioral difficulty at Westwood at the beginning of ninth grade. In September 2003, Leah stated that she had lost trust in Burton during an incident in which a boy in her class was arrested and handcuffed in the classroom. Although Leah did not witness the arrest, she heard laughter from behind a partition in the room and perceived that Burton and several adults were laughing at the handcuffed student. After the incident, she began to leave Burton's class without permission, on a near-daily basis. Burton's attempted solution to the problem was to reward Leah's good behavior with time away from class. Leah also arrived to school late and left early. Early departure was permitted by her Behavior Intervention Plan—an addendum to the IEP—but late arrival was not. The record is unclear as to the cause of Leah's late arrivals.

In the fall of 2003, Kathy Kelchner, an independent educational consultant and former education program specialist for the District, began to work privately with Leah on self-advocacy

---

[3] In quoting this same language to support the argument that Leah had regressed from the October 2002 levels mentioned in the ARD Committee report, which noted that Leah was reading at the third-grade level, Defendants inexplicably omit the word "high."

and social skills.  Kelchner also participated with Defendants at ARD Committee meetings, and observed Leah at school on November 4, 2003, for approximately three hours.  Before the Hearing Officer, she testified regarding her concerns with the manner in which Burton taught Leah, including her concern with Burton's statement to Leah that Burton was not to work on multiplication with Leah at the request of her parents, which conflicted with Kelchner's recollection that Leah's parents had specifically requested at an ARD Committee meeting that Burton work with Leah on multiplication.

On November 5, 2003, Leah was handcuffed and issued a citation for leaving the grounds of Westwood during school hours,[4] and on November 6, 2003, Leah's parents kept Leah home from school and wrote to Leah's psychiatrist, Dr. Richard Jaeckle, regarding the recent difficulties that Leah was having at school.  Dr. Jaeckle recommended that Leah be placed in a "homebound" setting—with education provided by the District at Leah's home—for six to eight weeks, to determine a more appropriate educational placement.  Leah's parents discussed the recommendation with Westwood's principal and psychologist on November 11, 2003, and it was determined that Leah would receive homebound education until the beginning of the spring semester in January 2004, that Leah would attend Jay Henderson's Behavior Adjustment class once she returned to Westwood, and that it would be best for Leah not to have contact with Burton or Burton's two paraprofessional assistants.  An ARD Committee convened on December 4, 2003 to implement the change in Leah's placement, and Leah received four days of homebound instruction prior to the winter break.

---

[4] Leah was apparently handcuffed at the request of her mother.

In January 2004, Leah returned to Westwood and was placed in Henderson's Behavior Adjustment class, as well as in several mainstream elective courses. Although the transition to Henderson's class initially appeared successful, Leah's behavior quickly deteriorated. By mid-January, she was frequently arriving to class late, leaving class early, and wandering the school halls. On one occasion, she evaded a school officer who was attempting to have her return to class. Her misbehavior included an outburst in Henderson's class: Leah overturned furniture and insulted Henderson and Burton,[5] using profane language. During another outburst, Leah disrupted testing taking place at Westwood, and was sent home. There is a dispute between the parties about how Henderson and other Westwood faculty responded to Leah's frequent absences from class. Kelchner testified that Henderson said "we quit following her because she's trying to get our attention. So we just let her roam[,] and we wait for her to come back to class." Henderson denied saying that "we would let her roam until she returns." It seems apparent that sometimes the District's employees supervised Leah during her absences, and sometimes they did not.

Leah's tardiness and absence from class continued into February 2004, and on February 22, 2004, Leah's parents maintain it was discovered that she was engaging in sexual activities in the boys' bathrooms at Westwood. At the due process hearing before the Hearing Officer, the District stipulated that Leah performed at least one sex act in the boys' bathroom at Westwood, after school. Defendants contend, and the Hearing Officer found, and the Court concurs, that such activity occurred on multiple occasions. On February 23, 2004, Dr. Jaeckle recommended

---

[5] It is clear that Leah had some contact with Burton despite the apparent understanding at the meeting of November 11, 2003, that Burton would not have further contact with Leah. It does not appear that this restriction was ever incorporated into Leah's IEP or related documents.

that Leah remain home from school until an alternative placement could be found, and her parents requested the same from the District. The District acceded to Defendants' request, placing Leah at Richardson High School ("RHS"), beginning March 15, 2004. The special education teacher assigned to the Behavior Adjustment course at RHS was on maternity leave, so the District hired a long-term substitute, Jeannie Mitchell, to instruct Leah for several weeks. The parties diverge in their assessment of Mitchell's qualifications, in part because she was not certified to teach in Texas. Mitchell testified that the District hired her to work directly with Leah, but that she received virtually no material from the District, such as Leah's IEP, to aid her. This is consistent with Mitchell's claim that an RHS teacher told her that the other teachers were told not to assist Mitchell with Leah's instruction. In fact, Mitchell learned of Leah's special needs—such as constant supervision—primarily from Leah's mother: "Never let her out of your sight." Mitchell eventually met with Henderson, who provided Mitchell with the second-grade instructional materials that Mitchell used to teach Leah. Leah's experience at RHS, which lasted two weeks, was consistent with her time at Westwood. She was absent at least one day, she left class without permission four times, she displayed sexually aggressive behavior,[6] and it was difficult to get her to work on her assignment sheets.

## B. Residential Placement of Leah

After approximately two weeks at RHS, Leah became physically aggressive at home, scratching her father and causing him to bleed. A few days earlier, Dr. Jaeckle had recommended that Leah's parents take Leah to the Seay Center, a psychiatric facility. After the

---

[6] The District cites a portion of the record for the proposition that Leah did not demonstrate any behavior of a sexual nature at RHS. The portion cited does not support that proposition and is, in any event, contradicted by Mitchell's testimony that Leah did in fact exhibit sexually aggressive behavior during, for example, a conversation with a fellow student regarding that student's boyfriend.

scratching incident, Leah's parents followed Dr. Jaeckle's advice. Leah's parents placed Leah at the Texas NeuroRehab Center ("TNRC") after two days at the Seay Center.[7] Thus, Leah's parents removed Leah from the District as of April 5, 2004. No notice was given to the District prior to the removal. The parties vigorously dispute the purpose of Leah's placement at the TNRC. Her parents claim, and the Hearing Officer found, that Leah's behavioral, educational, and medical problems were so intertwined that placement at a residential facility, like the TNRC, was necessary for her to have any opportunity to progress educationally. The District argues that Leah's parents placed Leah at the TNRC for non-educational reasons. The Court will address the dispute below.

When Leah arrived at the TNRC, Dr. Nilima Mehta performed an admission psychiatric evaluation, and noted in her report that Leah had been brought to the TNRC for "diagnostic evaluation and behavioral stabilization." Dr. Mehta's goal was to adjust Leah's medications "to control the behaviors and improve overall emotional functions and also oral functioning in the school setting, home setting, and outside in the community." The TNRC also performed a number of other evaluations on Leah, including an educational evaluation, a vocational evaluation, a minimal motor impairment evaluation, a therapeutic recreation assessment, an occupational therapy evaluation, and a speech-language evaluation. The educational evaluation, based upon a test known as the "Green Brigance," indicated that Leah was reading at the second-grade level and comprehending short reading passages at an upper-first-grade level. Leah did not complete the testing in mathematics.

---

[7] The Seay Center apparently focuses primarily on chemical dependency and depression, making it an inappropriate placement for Leah.

While at the TNRC, Leah attended the University Charter School ("UCS"). Dr. Walt Mercer performed her intake neuropsychological assessment on April 5 and April 16, 2004. He reported evidence of "significant neurocognitive decline" compared to previous assessments,[8] and recommended that Leah "continue to receive special education services through age 21 in order to develop educational and vocational skills to maximize her ability to live independently." The UCS developed an IEP for Leah, and provided her with physical therapy, occupational therapy, and counseling.

Leah's stay at the TNRC was marked by extreme physical and sexual aggression: she groped staff members and other patients, attempted to remove the clothing of several patients, refused to follow directions, refused to attend class, and even engaged in self-mutilation, all of which resulted in her frequently being physically restrained. A progress report on Leah's stay at the TNRC between May 11, 2004 and June 14, 2004 recorded the following: 6 instances of gestural threats, 3 instances of manipulation of staff, 171 instances of oppositional behavior, 1 instance of physical assault, 57 instances of physical aggression, 13 instances of property destruction, 3 instances of verbal intrusiveness, 3 instances of self-abuse,[9] 2 instances of physical or verbal intrusiveness, 1 instance of stealing, 37 instances of sexual aggression, 41 instances of sexualized verbalizations, 44 instances of teasing and provoking peers, 106 instances of being unaccountable to staff, 14 instances of verbal abuse, 46 instances of verbal outbursts, 3 instances of verbal threats, 3 instances of whining, 21 instances of physical intrusiveness, 94 instances of

---

[8] The report references multiple previous assessments, the earliest of which was performed in January 1994. Presumably, the results of Leah's past assessments are maintained in a medical file accessible by attending physicians.

[9] One instance of self-abuse involved Leah carving the word "mad" into her skin.

sexual intrusiveness, and 27 instances of therapy refusal.[10]  The report noted that Leah was contained or restrained twenty times during the same period, which Dr. Mehta considered very high.  Ray Spell, a nurse manager at the TNRC who interacted with Leah and was familiar with her case, testified that her behavior was worse during school.  Dr. Mehta considered Leah one of her most difficult patients, and attributed her behavioral difficulties to three factors: first, Leah was testing her limits in the restrictive TNRC placement; second, Dr. Mehta made many changes in Leah's medications in an attempt to find the correct medication for her disorders, and this likely contributed to her behavioral outbursts; and finally, Leah's bipolar disorder caused rapid and cyclical changes in her mood and behavior.  Dr. Mehta testified that Leah's behavior did not significantly improve until August 19, 2004, shortly after Leah started taking the medication Clozaril.  She attributed the improvement to a combination of the structured environment of the TNRC, medication, and intensive counseling and therapy sessions.  Despite these improvements, Dr. Mehta noted that Leah would likely be rebellious and need supervision and structure for a long time, given that her oppositional behavior causes her to test limits frequently.

When Leah was discharged from the TNRC on November 12, 2004, Dr. Mehta recommended that Leah attend a special education class with one-on-one supervision to prevent behavioral problems that arise when Leah is left unsupervised.

### C. The Final ARD Committee Meeting

In June 2004, approximately two months after Leah's parents unilaterally removed her from the District, her parents requested an ARD Committee meeting to ask for placement of

---

[10] Leah's behavior during the subsequent one-month period was largely the same, with fewer instances of certain behaviors and additional instances of behaviors such as self-abuse and sexual intrusiveness.  She was contained or restrained twenty-six times during the reporting period.

Leah by the District at the TNRC.  Leah's parents provided the ARD Committee with Leah's assessments from the TNRC, and the group convened on three days—June 9, 17, and 23—to discuss Leah's placement.  The ARD Committee ultimately denied the parents' request that Leah be placed in a residential setting, finding that the District could provide her an appropriate public education in a public setting.  The IEP developed at the June 2004 meeting was substantially similar to Leah's previous IEPs, with several exceptions.  The June 2004 IEP noted that Leah's parents reported sexually inappropriate and physically and verbally aggressive behavior at the TNRC.  Additionally, the IEP stated that "[i]f Leah were to become a threat to the safety of others or herself, a therapeutic hold will be used by trained personnel."  However, it provided for line-of-sight supervision only of Leah outside the classroom: "Following her too closely could lead to increasing her agitation [and] oppositional feeling."  The IEP placed Leah in the Behavior High School Program at RHS with one-on-one adult supervision all day, which was the case when Mitchell taught Leah prior to her removal from the District.  It included the goals of having Leah progress to a beginning-fifth-grade level in mathematic reasoning, a mid-fifth-grade level in mathematic calculation, a beginning-fifth-grade level in reading, and a beginning-fourth-grade level in writing.  Finally, the IEP included twenty thirty-minute in-home training sessions, and twenty thirty-minute parent-training sessions.[11]  Before the ARD Committee, Leah's parents argued that the District was adequately accounting neither for the behavior that Leah exhibited, nor for the academic regression documented at the TNRC and the UCS.

Leah's parents elected to keep Leah at the TNRC, until she was discharged on November 12, 2004.  They filed a request for an administrative due process hearing on July 28, 2004,

---

[11] The June 2004 IEP also noted that "Leah can read at a 4th grade level; however her emotional stability greatly affects her ability to perform."

alleging that the District failed to provide a free appropriate public education to Leah, and requesting reimbursement for her placement at the TNRC from April 1, 2004 onward. The presiding Hearing Officer found that the District had not provided Leah with a free appropriate public education and awarded Defendants $56,000 for their costs associated with Leah's placement at the TNRC. The District challenges the Hearing Officer's determinations.

## ANALYSIS

In reviewing a state hearing officer's decision in an impartial due process hearing conducted under the IDEA, federal district courts receive the administrative record and additional evidence requested to be made a part of the record by any party. 20 U.S.C. § 1415(i)(2)(C)(i)–(ii). Although the court is required to reach an independent decision based on a preponderance of the evidence, this requirement "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 206 (1982). Instead, "due weight" is to be given to the hearing officer's decision. *Id.* To emphasize, "courts must be careful to avoid imposing their view of preferable educational methods upon the States. The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207.

Thus, in reviewing a parent's or guardian's challenge to a school district's provision of educational and related services to a disabled child, a court asks first whether the school district complied with the relevant procedures of the IDEA, and second whether the IEP developed

through those procedures was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *see also Michael F.*, 118 F.3d at 248. Leah's parents do not levy a procedural challenge; thus, if the Court finds that the District implemented an IEP for Leah that was reasonably calculated to enable her to receive educational benefits, the District is absolved of further responsibility. *Rowley*, 458 U.S. at 207. If the Court finds otherwise, it must examine Defendants' request for reimbursement for the costs associated with unilaterally removing Leah from the District and placing her at a residential institution: where a "suitable or 'appropriate' public educational placement is not available for a disabled child within a state or local school district, the district must pay the costs of sending the child to an appropriate private institution." *Michael F.*, 118 F.3d at 248; *see also Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985) (concluding that the IDEA authorizes courts to "reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act"). Reimbursement is available where parents unilaterally withdraw a child from an inappropriate public setting, so long as the private placement was proper under the IDEA. *Michael F.*, 118 F.3d at 248.

In Leah's case, the Hearing Officer found that the District did not provide a free appropriate public education to Leah, that the residential placement of Leah was proper because of her conditions, and that reimbursement was therefore warranted. The District now challenges those determinations. The issues of primary importance to the Court are thus: (1) whether the IEP that the District developed for Leah in June 2004 was reasonably calculated to enable her to receive educational benefits, and, if not, (2) whether the parents' unilateral placement of Leah at the TNRC was appropriate. Before reaching those questions, however, the Court must address

two issues raised by the parties. The first arises from the unique arrangement between the TNRC and the UCS, and the second concerns which party bears the burden of proof before this Court.

*A. Hybrid Placement*s

Assuming that the Court accepts Defendants' argument that the District did not provide Leah a free appropriate public education, the issue is whether her unilateral placement at TNRC was appropriate. The appropriateness of a unilateral *private* placement, however, is not gauged by the same standards applicable to alternative public placements, namely the requirements contained within the IDEA's definition of a "free appropriate public education." *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 9–10 (1993); *see* 20 U.S.C. § 1401(9). Rather, "[r]eimbursement will be permitted under *Burlington* when unilateral placement by parents [in a private setting] is generally found to be appropriate, even though it is not 'the exact proper placement required under the Act.'" *Michael F.*, 118 F.3d at 248 n.13 (quoting *Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir. 1986)); *see also Burlington*, 471 U.S. 359, 369 (1985). However, the situation before the Court presents a hybrid situation, however, that appears to be one of first impression. Specifically, the evidence before the Court establishes that while the TNRC is a private residential facility, the UCS is a public school,[12] and Leah, while placed at the TNRC, attended the UCS. The District argues that because the UCS is a public school, the *Carter* exception to judging the appropriateness of a parental placement does not apply, such that the appropriateness of Defendants' placement of Leah at the TNRC is

---

[12] Jessica Nickels, a teacher at the TNRC, testified before the Hearing Officer that it was her understanding that charter schools, such as the University Charter School, are public and provide education free of charge. Furthermore, at the hearing before this Court on October 4, 2006, counsel for Defendants stated that "[t]he University Charter School is not a private school. It is a public school. Charter schools are public schools. That is why the University Charter School has to develop individual education plans for students, because they are public schools." In light of Nickels' testimony, and the concession of Defendants' counsel, the Court finds that the UCS is a public school. Defendants' arguments to the contrary are unavailing.

adjudged by the requirements contained within the IDEA. In essence, the District argues that Defendants are not entitled to have their unilateral placement of Leah judged by the generalized standard of appropriateness as set forth in *Michael F.*, 118 F.3d at 248 n.13.

Before responding to the merits of the District's contention, Defendants urge that the District has waived its ability to assert that the UCS is a public school because it did not raise the issue before the Hearing Officer, and because the District's briefing submitted to the Hearing Officer, and the District's allegations in its Original Complaint in this action, assumed Leah's parental placement to be a private one. The Court disagrees with Defendants' characterization of the District's arguments in the Original Complaint and before the Hearing Officer. In both, the District consistently urged application of the *Michael F.* factors to the UCS, factors which incorporate portions of the IDEA's definition of "free appropriate public education," that would not apply in full to private placements under *Carter*. 510 U.S. at 13. Defendants also argue that the District's Original Complaint, in paragraph 42(c), "asserted that [Leah's] placement at [the TNRC and the UCS] was a private placement." Paragraph 42(c) states that the "Hearing Officer erred as a matter of law by failing to place the burden of proof on [Defendants] to show that the private placement at [the TNRC] and [the UCS] provided Leah with an appropriate education." The paragraph goes on to argue for application of the *Michael F.* factors. This paragraph cannot be read as "asserting" that Leah's placement was private. Furthermore, contrary to Defendants' argument that they "admitted" to the facts contained in the referenced paragraph, which might establish them as undisputed pursuant to Federal Rule of Civil Procedure 8, in their Answer, Defendants specifically denied the allegations in paragraph 42(c). Accordingly, the Court finds

that the District has not waived its ability to argue that Leah's placement by her parents was a private one.

As to the merits of the District's argument, the Court respectfully disagrees with the District's position. Although it does not appear that any court has addressed by what measure the appropriateness of a hybrid placement is judged, the Court determines that it is bound by the Supreme Court's pronouncement in *Carter*. In *Carter*, the Supreme Court addressed "whether a court may order reimbursement for parents who unilaterally withdraw their child from a public school that provides an inappropriate education under [the] IDEA and put the child in a private school that provides an education that is otherwise proper under [the] IDEA, but does not meet all the requirements of [20 U.S.C. § 1401(9)]."[13] *Carter*, 510 U.S. at 9. The Supreme Court held that a court may order such reimbursement, "because [§ 1401(9)'s] requirements cannot be read as applying to *parental placements*." *Id.* at 13 (emphasis added). Even assuming that the Supreme Court used the phrase "parental placements" with the understanding that such placements invariably involve private schools, the logic undergirding *Carter* comfortably extends to the case before this Court. The Supreme Court based its decision on the observation that the requirements of § 1401(9) "do not make sense in the context of a parental placement." *Id.* Section 1401(9) defines "free appropriate public education" as special education and related services that

> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;

---

[13] Since July 1, 2005, § 1401(9) has contained the definition of "free appropriate public education" that the Supreme Court addressed in *Carter* as § 1401(a)(18). *See Carter*, 510 U.S. at 9; 20 U.S.C. § 1401(9); Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, § 602, 118 Stat. 2647, 2652–59 (2004) (codified at 20 U.S.C. § 1401). That amendment does not alter the analysis in this case.

> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

As with private placements, these requirements are ill-suited to address hybrid scenarios, which involve a mix of education or related services provided at private expense by institutions not bound by the requirements of the IDEA or even necessarily by state educational agencies. For example, in Leah's case, although the UCS is a public school that in fact developed an IEP for Leah, an integral part of her education involved her residential placement at the TNRC, over which the UCS could exercise no actual control through the IEP it developed for Leah.[14] Furthermore, hybrid placements allay in part the concern—expressed by the petitioning school district in *Carter*—that reimbursement exacts a heavy toll from "financially strapped local educational authorities," as the cost of the public component of a hybrid placement is already controlled by the local educational agency. *See id.* at 15. For these reasons, the Court concludes that the requirements of § 1401(9) "cannot be read as applying to parental placements," where, as here, parents or a guardian place a disabled child in a private residential facility with publicly provided education. Consequently, in reviewing the appropriateness of Leah's residential placement at the TNRC and the UCS, the Court will address only whether the placement "is generally . . . appropriate, even though it is not 'the exact proper placement required under the Act.'" *Michael F.*, 118 F.3d at 248 n.13 (quoting *Alamo Heights*, 790 F.2d at 1161).

---

[14] The IEP developed by the UCS states that a number of services will be provided to Leah by the TNRC—including full-time supervision, physical therapy, occupational therapy, and counseling—but those are clearly provided at private expense by the TNRC by agreement.

*B. Burden of proof*

In the Fifth Circuit, "a party attacking the appropriateness of an IEP established by a local educational agency bears the burden of showing why the IEP and the resulting placement were inappropriate under the IDEA." *Michael F.*, 118 F.3d at 252. In this case, Leah's parents challenged Leah's IEP in a state administrative proceeding and prevailed. The parties dispute whether the burden still lies with the parents in this proceeding, given that the District appeals the Hearing Officer's determination. The Court is aware of no authority that transfers the burden, as Defendants request, to a school district when the parents or guardian of a disabled child prevail at the administrative proceeding. Indeed, although it appears that the Fifth Circuit has not expressly stated so, it has applied the burden set forth in *Michael F.* to parents who prevailed below, including in the *Michael F.* case itself. *Id.*; *see also Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000). Defendants, relying on *Schaffer v. Weast*, argue that the default rule of placing the burden of persuasion on the party seeking relief should apply. 546 U.S. 49, 51 (2005). There, the Supreme Court addressed the issue of which party in an administrative hearing, requested pursuant to the IDEA, bears the burden of proof. *Id.* In a narrow holding, the Court stated that the "burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Id.* at 62. Although it is clear that the Supreme Court did not address the burden of persuasion in a proceeding such as that before this Court, the logic of *Schaffer* may extend to placing the burden in this proceeding upon the District; however, it is the Fifth Circuit's prerogative to conclude as much and, in effect, overturn the implicit holding of *Michael F.* that appears to bind this Court. In any event,

resolution of the question is not outcome determinative, so the Court assumes without holding that Defendants bear the burden of proof in challenging the District's proposed IEP of June 2004.

*C. The District's IEP*

As set forth above, the first question the Court must address in determining whether Leah's parents are entitled to reimbursement for withdrawing her from the District and placing her at the TNRC and the UCS is whether "an IEP calling for placement in a public school was inappropriate under the IDEA." *Michael F.*, 118 F.3d at 248. The inquiry does not turn upon whether the District provided Leah with an education designed to maximize her potential. *Id.* at 247–48. As the IDEA guarantees a "basic floor or opportunity," the District is only bound to provide "access to specialized instruction and related services which are individually designed to provide educational benefit." *Rowley*, 458 U.S. at 201. "Nevertheless, the educational benefit to which the [IDEA] refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be 'likely to produce progress, not regression or trivial educational advancement.'" *Michael F.*, 118 F.3d at 248 (footnotes omitted) (quoting *Bd. of Educ. of the E. Windsor Reg'l Sch. Dist. v. Diamond*, 808 F.2d 987, 991 (3d Cir. 1986)). In other words, an IEP must be geared to provide "meaningful" educational benefit.[15] *Rowley*, 458 U.S. at 192; *see also Michael F.*, 118 F.3d at 248. In determining whether an IEP satisfies this standard, the Fifth Circuit has endorsed consideration of the following factors: (1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are

---

[15] The parties dispute the significance of the word "meaningful." It is clear that an IEP need not actually produce meaningful educational benefit, but equally clear that the Fifth Circuit considers actual benefit relevant to the determination of whether the IEP was reasonably calculated to produce meaningful benefit. *Michael F.*, 118 F.3d at 248, 253–56.

provided in a coordinated and collaborative manner by the key "stakeholders"; and (4) whether positive academic and non-academic benefits are demonstrated. *Michael F.*, 118 F.3d at 253. In this case, Leah's parents do not contest that Leah's IEP was administered in the least restrictive environment; indeed, it would be strange to contest this prong while simultaneously arguing, as Defendants do, that only residential placement is appropriate. Instead, they argue that the remaining three factors demonstrate that the District's proposed placement of Leah, at the June 2004 ARD Committee meeting, was inappropriate.

As is evident from the Court's review of the record, the District's obligation to provide Leah a free appropriate public education during her ninth-grade year turned into a Sisyphean challenge: every brief period of modest gain ended in acute regression, with no progress from peak to peak. In fact, Leah's last teacher at the District, Jeannie Mitchell, used second-grade instructional materials even though Leah's eighth-grade assessment placed her reading and arithmetic levels at those of a fourth-grade student, and even though the IEP developed at the beginning of Leah's ninth-grade year included the goal of improving her reading skills in comprehension to those of a proficient third-grade student, and of improving her mathematics skills to those of a fifth-grade student.[16] The District's attempts to adduce evidence of Leah's educational benefit at Westwood and RHS are belied by a consistent pattern of regress. It is true, as the District contends, that Leah was able to complete various school assignments at certain points during her ninth-grade year; however, Leah's progress in those instances bears little connection to the goals stated in her IEP, and corresponds strongly to a cyclical pattern of behavioral and academic regress. This is not particularly striking, given the difficultly the

---

[16] The point is further confirmed by the assessment conducted by TNRC upon Leah's admission in April 2004, which placed her reading skills at the first- or second-grade level.

District experienced in keeping Leah in the classroom. She routinely came to class late, left without permission, and roamed the halls without supervision. Accordingly, the Court agrees with the Hearing Officer's conclusion that "the evidence is quite sparse regarding meaningful progress either academically or non-academically for Leah during the 2003–2004 school year." In making this finding, the Court accords due weight to the Hearing Officer's conclusion, which was reached with the benefit of educational expertise and having all evidence presented directly to her.

As Defendants argue that only residential placement of Leah is appropriate, perhaps more legally significant than the District's failure to provide actual academic or non-academic benefit to Leah is the District's inability to address the causes of that failure. It is evident from the record that Leah's behavioral difficulties caused her frequent absence from the classroom. This is confirmed by the IEP of September 25, 2003, which required supervision of Leah at all times and that she stay in the classroom unless she had permission to leave. The ARD Committee and Leah's parents clearly recognized this problem, by the agreed inclusion in Leah's IEP of measures to address it. Nevertheless, the evidence establishes that the District, despite the IEP, was unable to keep Leah consistently in the classroom. Even when Leah was in the classroom, there is reason to doubt that her education was provided in a truly collaborative fashion by her teachers. There is no doubt that the relevant parties participated in all of Leah's ARD Committee meetings, but it is less clear that those actually charged with her education, such as Mitchell, collaborated to provide an appropriate education. Mitchell testified that although the District selected her to give Leah one-on-one instruction at RHS, she was not provided with Leah's IEP, and she encountered difficultly when seeking assistance from other teachers.

Based on the *Michael F.* factors, the Court further determines that the District's proposed placement of Leah at RHS in the IEP of June 2004 was inappropriate. In this case, it is clear that Leah could receive no educational benefit from the proposed placement because the District's IEP was not reasonably calculated to provide any educational benefit to Leah.[17] Her frequent outbursts, caused by her emotional and behavioral disorders, made it difficult for the District to keep Leah in the classroom, and resulted in serious educational regression that frustrated the District's ability to provide her any benefit. Leah's final outburst prior to leaving the District exemplifies the problem: subsequent testing at the TNRC revealed that her reading and mathematics levels were far lower than the District considered them to be. The District responds that the testing done at the TNRC is unreliable, principally because Leah was uncooperative and refused all educational services at the time of her evaluation.[18] The District's argument misconstrues the function of the IDEA. Undoubtedly, special education provided pursuant to the IDEA often involves accommodating severe behavioral problems that make instruction and testing quite difficult. Leah's situation is representative. The District cannot simply respond, however, that Leah performs well when tested at the "appropriate" time, as this effectively assumes away her disability. Rather, the District must provide Leah an appropriate education *in*

---

[17] Although the District is correct that the controlling inquiry in determining whether Leah's proposed IEP was appropriate is whether the IEP was reasonably calculated to provide meaningful educational benefit, the implementation and results of past IEPs are potentially relevant in addressing the factors set forth in *Michael F.*, 118 F.3d at 253. The implementation and results of past IEPs are especially relevant where, as here, the school district's past efforts to provide a free appropriate public education failed over an extended period of time, such that the failure of the past IEPs was not aberrant, and a court can conclude that it would be unreasonable to expect the proposed IEP to provide meaningful educational benefit.

[18] The District attacks the reliability of the TNRC assessment of Leah on a number of other grounds as well. The various critiques are undercut by the correlation between the results of the TNRC's assessments and the actual level of the instructional materials used by both Henderson and Mitchell to teach Leah while at Westwood and RHS. Furthermore, a number of the critiques are inapt in light of the Court's determination that hybrid placements are not judged by the same standards applicable to public placements. *See Carter*, 510 U.S. at 13.

*spite of* her disability.  This is not to suggest anything more than that the District is obligated to implement a plan reasonably calculated to provide meaningful benefit to Leah.

Accordingly, the Court concludes that Leah's proposed public placement by the District in the June 2004 IEP was inappropriate and not reasonably calculated to confer any educational benefit upon Leah.

### D. Leah's Residential Placement

Having found that the District's proposed public placement of Leah was not reasonably calculated to provide educational benefit, the Court turns to Defendants' unilateral placement of Leah in a residential facility.  *See* 20 U.S.C. § 1412(a)(10)(C).  The Court must determine whether Leah's residential placement was appropriate under the IDEA.  *Michael F.*, 118 F.3d at 248.  "Despite the statutory preference for mainstream placements, the IDEA recognizes that some disabled students need full-time care in order to receive educational benefit."  *Indep. Sch. Dist. No. 284 v. A.C.*, 258 F.3d 769, 774 (8th Cir. 2001).  In such cases, "[a]nalysis must focus . . . on whether full-time placement may be considered necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process."  *Kruelle v. New Castle County Sch. Dist.*, 642 F.2d 687, 693 (3d Cir. 1981).

On this issue, the Court finds that Leah could achieve no academic progress short of residential placement, and thereby agrees with the Hearing Officer's determination that although Leah's stay at the TNRC had a medical purpose, that purpose "was inextricably intertwined with the behavior and educational problems Leah had."  The District relies heavily upon *Swift v. Rapides Parish Public School System* to argue that Leah could achieve meaningful benefit short

of residential placement. 812 F. Supp. 666 (W.D. La. 1993). In *Swift*, "a head-count of clinical experts indicate[d] that residential placement [was] necessary for [the disabled student] to make progress consistent with his abilities." *Id.* at 672. Despite his public placement, he was receiving "meaningful educational benefit in his current placement." *Id.* at 673. Faced with such evidence, the court in *Swift* correctly found that the IDEA does not require optimized education, but simply an education "designed to confer *some* meaningful educational benefit on the child." *Id.* at 673 (emphasis in original) (citing *Rowley*, 458 U.S. at 200–01). The facts here differ. Dr. Mehta, who treated Leah at the TNRC, testified that Leah was extremely difficult in the first part of her stay at the TNRC: she exhibited extreme physical and sexual aggression, and engaged in self-mutilation. Her behavior was worse during school hours, according to a nurse manager at the TNRC, and Leah was frequently restrained to prevent her from physically or sexually intruding upon her peers, and was persistent in frustrating attempts at order and structure. The oppositional behavior exhibited by Leah at the TNRC was consistent with that at Westwood and RHS. There, Leah evaded her teachers and left class without permission. In contrast to the District's inability to cope with Leah's behavior, the extremely structured environment of the TNRC and the UCS allowed Dr. Mehta and others to address Leah's behavioral problems so that she could benefit from instruction. Specifically, employees of the TNRC supervised Leah at all times, provided extensive counseling and therapy, and reacted immediately to all behavioral outbursts.

The District is correct in noting that despite the alleged advantages of Leah's residential placement, she did not actually meaningfully progress for much of her time at the TNRC and the UCS. The severity of Leah's conditions precluded educational progress, however, until her

behavioral problems could be managed to allow beneficial instruction. Leah's "main learning problem is [her] *inability to cooperate* with authority. Accordingly, the only appropriate placement for [Leah] is one which specifically takes into account and provides for this lack of cooperation." *Clevenger v. Oak Ridge Sch. Bd.*, 744 F.2d 514, 516 (6th Cir. 1984); *see also Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997) ("If institutionalization is required due to a child's emotional problems, and the child's emotional problems prevent the child from making meaningful educational progress, the Act requires the state to pay for the costs of the placement.").[19] This finding is confirmed by the progress that Leah achieved toward the end of her stay at the TNRC.

The Court therefore concludes that the only appropriate placement of Leah in June 2004 was at a residential facility. Any progress in Leah's education during that time was unlikely, but it is clear that only the structured environment of a residential placement could offer her any hope of benefit.

### E. Reimbursement

Having concluded that the District's proposed placement of Leah in June 2004 was inappropriate and that her residential placement was appropriate, the Court must now determine the reimbursement to which Leah's parents are entitled. 20 U.S.C. § 1412(a)(10)(C).

---

[19] The District additionally argues that Leah's placement at the TNRC and the UCS was due to problems at home. Although the precipitating event that led to Leah's withdrawal from the District and interim-placement at the Seay Center was an altercation with her father at home, the overwhelming evidence indicates that Leah's problems at home were minimal compared to her behavioral difficulties at school. This is confirmed by the observation at the TNRC that Leah's behavior worsened during school hours. The District additionally argues that the ultimate determination that Leah's placement at the TNRC was medically necessary, made by Defendants' insurance agency after Defendants appealed the denial of insurance coverage for Leah's placement at the TNRC, means that the Hearing Officer erred, and that this Court would err, in concluding that Leah's placement had non-educational purposes. An insurance agent's determination of medical necessity is not dispositive. The relevant question here is whether the medical purposes were segregable from the educational ones, not simply whether medical purposes existed.

Defendants removed Leah from the District as of April 2004, and an ARD Committee convened on June 9, 2004 to discuss Defendants' request for residential placement of Leah at public expense. The Hearing Officer found that the District had actual notice of Defendants' desire to place Leah at the TNRC at public expense by June 2, 2004, and awarded reimbursement for all expenses incurred by Defendants after June 2, 2004, except for those covered by Defendants' insurance carrier, which provided coverage until July 1, 2004.[20] The District requests that any reimbursement award be reduced or denied principally because Defendants failed to comply with the statutory notice requirements of the IDEA.

The first issue for the Court to determine is what costs associated with Leah's placement at the TNRC are reimbursable. The IDEA guarantees a free appropriate public education that consists of "special education and related services." 20 U.S.C. § 1401(9). In relevant part, special education includes "instruction conducted . . . in hospitals and institutions, and in other settings." 20 U.S.C. § 1401(29); *see also Mrs. B.*, 103 F.3d at 1121 ("The IDEA explicitly provides that in certain cases a state may have to pay for institutionalized care for a handicapped child."). The portion of Leah's placement spent at the UCS was apparently provided at public expense, free of charge to Defendants. The relevant inquiry therefore turns on what services were provided Leah by the TNRC and whether those services are "related services" under the IDEA. Related services "means transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in

---

[20] Defendants' insurance provider covered approximately ninety days of Leah's placement at the TNRC, from April 2004 until July 1, 2004. Thus, although the Hearing Officer concluded that the District had notice of Defendants' desire to place Leah at the TNRC at public expense by June 2, 2004, the Hearing Officer did not include in her calculation reimbursement for expenses incurred between June 2, 2004 and July 1, 2004.

children." 20 U.S.C. § 1401(26)(A). The IDEA lists the following as examples of related services: "speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services." 20 U.S.C. § 1401(26)(A). However, "medical services shall be for diagnostic and evaluation purposes only," and related services do not include "a medical device that is surgically implanted, or the replacement of such device." 20 U.S.C. § 1401(26)(A)–(B). Regulations promulgated under the IDEA clarify what costs associated with residential placement are reimbursable: "If placement in a public or private residential program is necessary to provide special education and related services to a child with a disability, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 34 C.F.R. § 300.104. The parties have not addressed this specific issue in the briefing before the Court. Accordingly, if the parties cannot agree on the amount, the Court **ORDERS** Defendants to submit, by **September 4, 2007**, a brief regarding the specific costs incurred in Leah's placement at the TNRC, with citations to the record and specific argument as to whether each particular cost is reimbursable. The District may respond by **September 11, 2007**. The parties shall take into account the Supreme Court's guidance in *Cedar Rapids Community School District v. Garrett F.*, 526 U.S. 66, 73–74 (1999) ("the term 'medical services' refer[s] only to services that must be performed by a physician, and not to school health services").

Alternatively, the parties may stipulate, by September 4, 2007, as to the specific amount of

reimbursement that Defendants are entitled to by the preceding portions of this Memorandum

Opinion and Order, without prejudice to either parties' ability to appeal the balance of this Order.

The District requests that the Court reduce or deny reimbursement for Leah's parents'

failure to provide adequate notice of their intent to withdraw Leah from RHS and place her at the

TNRC. The "cost of reimbursement . . . may be reduced or denied" for a variety of reasons,

including failure by a disabled student's parents to provide adequate notice to the ARD

Committee of their intent to withdraw the student from the public placement and place her in an

alternative setting at public expense. 20 U.S.C. § 1412(a)(10)(C)(iii). Leah's parents concede

that they did not provide Leah's ARD Committee with notice when they withdrew her from the

District, but argue that a statutory exception should apply. Section 1412(a)(10)(C)(iv)(I)(cc)

provides that the cost of reimbursement "shall not be reduced or denied for failure to provide

such notice if . . . compliance . . . would likely result in physical harm to the child," and

§ 1412(a)(10)(C)(iv)(II)(bb) provides that the cost of reimbursement "may, in the discretion of a

court or a hearing officer, not be reduced or denied for failure to provide such notice if . . .

compliance . . . would likely result in serious emotional harm to the child."  Leah's parents argue

that one of the exceptions should apply because Leah was placed at the Seay Center on the

recommendation of Dr. Jaeckle, her psychiatrist. They contend in their briefing that Dr. Jaeckle

"recommended that she be placed in a locked, residential facility immediately." For support,

they initially cite Leah's mother's testimony, which indicates that Dr. Jaeckle recommended that

Leah be taken to the Seay Center, a day treatment psychiatric facility. The cited testimony does

not support Defendants' contentions in their briefing: it does not indicate that Leah was in danger

of physical or serious emotional harm absent immediate removal, and it does not state that Dr.

Jaeckle recommended a "locked, residential facility immediately." The parents additionally point to a letter authored by Dr. Jaeckle on May 17, 2004, in which he states that Leah "is a threat to herself and to others through her sexual behavior with boys and aggressiveness toward her younger sister." The letter does not indicate that she presented that same threat six weeks earlier when she was removed from the District, or that failure to remove her might result in physical or serious emotional harm. Finally, Defendants point to an incident at home where Leah scratched her father's arm so that it bled. The facts surrounding the incident are not clearly elaborated upon in the record, yet it appears that Leah and her father argued about something. Absent more, the Court cannot conclude that Leah's escalated argument, at home, with her father evidences potential physical or serious emotional harm to Leah at school if she were not withdrawn. Accordingly, the Court agrees with the Hearing Officer that the statutory exceptions to the notice requirement of § 1412(a)(10)(C) do not apply.

As the exceptions do not apply to Defendants' failure to provide adequate notice, reimbursement may be denied, reduced, or awarded in full, pursuant to the discretion afforded by § 1412(a)(10)(C). In exercising such discretion, the Hearing Officer found that the District had actual notice of Defendants' desire to place Leah at the TNRC at public expense, by June 2, 2004, and awarded reimbursement for all expenses incurred by Defendants after June 2, 2004, except for those covered by Defendants' insurance carrier, which provided coverage until July 1, 2004. The result was an order of reimbursement of $56,000. The Court agrees with the Hearing Officer's finding that the District knew by June 2, 2004 of Defendants' intent to place Leah at the TNRC. Therefore, the Court finds it appropriate to reimburse the parents for reimbursable expenses incurred after that date. In exercising its discretion in this manner, the Court is not

persuaded by the District's contentions that Defendants acted unreasonably or were responsible for the District's inability to provide an appropriate education to Leah. Leah's parents cooperated on numerous occasions with Leah's ARD Committee to develop an IEP for her, and requested at the final meeting that the ARD Committee take into account the TNRC's reports of Leah's progress, which evidenced severe regression. The ARD Committee's proposed placement did not, in the Court's view, account for the latest evidence of Leah's academic and behavioral status. The Court is similarly unpersuaded by the District's argument that had Defendants raised the prospect of residential placement in a timely fashion, it could have properly addressed the request. In support, the District argues that it would have, among other things, made an on-site visit to the TNRC to determine whether it could provide the services listed in Leah's IEP, and verified that the TNRC met the requisite standards for health and safety. There is no evidence that the District performed such due diligence when given the opportunity in June 2004.

Defendants contest the Hearing Officer's refusal to reimburse those costs incurred during the reimbursable period that were covered by Defendants' insurance provider. The District does not respond. The Court agrees with Defendants "that parents of a handicapped child cannot be required to utilize their private medical insurance benefits where the utilization of those benefits would cause them to incur a financial cost. Any other conclusion would be inconsistent with the concept of a *free* appropriate public education." *Seals v. Loftis*, 614 F. Supp. 302, 305–306 (E.D. Tenn. 1985) (emphasis added); *see also Raymond S. v. Ramirez*, 918 F. Supp. 1280, 1293–94 (N.D. Iowa 1996). A reduction in lifetime benefits under an insurance policy constitutes such a loss. *Seals*, 614 F. Supp. at 306; *Ramirez*, 918 F. Supp. at 1294. Defendants are therefore

entitled to reimbursement of allowed costs that caused a reduction in lifetime benefits under their insurance policy. In filing the supplemental briefing ordered above, Defendants shall also detail the specific amount of the reduction in lifetime benefits that they claim they incurred as a result of the residential placement of Leah after June 2, 2004. They shall also address what portion of that cost is reimbursable under the IDEA, and what portion was spent on medical services not for diagnostic and evaluation purposes. Alternatively, as above, the parties may stipulate as to the amount of the reduction in lifetime benefits incurred by Defendants that is reimbursable under the IDEA.

## REHABILITATION ACT OF 1973

Defendants previously requested that the Court dismiss their claims under § 504 of the Rehabilitation Act of 1973. *See* 29 U.S.C. § 794. The Court dismissed those claims with prejudice in its Memorandum Opinion and Order of June 19, 2006. Defendants mistakenly reasserted those claims in their Motion for Judgment on the Record, and the District requests that the Court, in addition to reaffirming its dismissal of those claims, sanction Defendants for the mistake. Defendants admitted the error and withdrew their reassertion of the claims. The Court declines to sanction Defendants for what appears to be an innocent lapse and declines to award the District attorneys' fees for time spent responding, as little to no response was merited.

## ATTORNEYS' FEES

Defendants request that the Court award them attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I), which allows such an award in a case brought pursuant to the IDEA "to a prevailing party who is a parent of a child with a disability." The District responds by moving the Court to strike Defendants' affidavit testimony regarding the expenditure of such fees. The

ensuing dispute between the parties, which focuses on whether Defendants are now allowed to

present additional evidence as to the amount of such fees, consumes nearly twenty pages of the

parties' briefing and borders on the absurd. Notwithstanding the IDEA's provision of attorneys'

fees, Federal Rule of Civil Procedure 54(d)(2) states that "[u]nless otherwise provided by statute

or order of the court, the motion [for attorneys' fees and related nontaxable expenses] must be

filed no later than 14 days after entry of judgment," and "must state the amount or provide a fair

estimate of the amount sought." Now that the Court has determined that the District failed to

provide a free appropriate public education to Leah and that her residential placement was

appropriate, it is clear that Defendants are the prevailing party. The Court therefore exercises the

discretion granted to it pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(I) to award Defendants

reasonable attorneys' fees and costs. The amount of such fees and costs is now ripe for

determination. The District's arguments to the contrary make too much of the Court's

Memorandum Opinion and Order of June 19, 2006, which ordered the presentation of "additional

evidence" pursuant to 20 U.S.C. § 1415(i)(2)(C). Section 1415(i)(2)(C) requires a district court,

in reviewing administrative proceedings initiated pursuant to the IDEA, to receive the records of

the proceedings, to hear "additional evidence," and to base its decision on the preponderance of

the evidence. The District's argument that "additional evidence" presented pursuant to that

provision must include evidence as to the amount of attorneys' fees before the Court's merits

determination is without merit. That provision plainly deals with the evidence relevant to a

district court's review of the administrative findings and decision below. 20 U.S.C.

§ 1415(i)(2)(A). Accordingly, the District's Motion to Strike the Appendix to Defendants'

Motion is **DENIED**.

Under the authority of 28 U.S.C. § 636(b) and Rule 2(c)(3) of Miscellaneous Order No. 6 of this District, it is **ORDERED** that the issue of the amount of reasonable attorneys' fees and costs to which Defendants are entitled is hereby **REFERRED** to United States Magistrate Judge Irma C. Ramirez for hearing, if necessary, and determination, following the parties' briefing of the matter. Defendants shall file their motion for attorneys' fees and costs by **September 10, 2007**, and the District shall respond by **September 21, 2007**. To the extent that the District requests discovery on the issue of attorneys' fees, it shall make that request to United States Magistrate Judge Ramirez, who will determine what discovery to permit.

All future filings regarding the referred matter should be addressed to United States Magistrate Judge Ramirez, not to the district judge, and shall be accompanied by a transmittal letter addressed to her, so that filings will reach United States Magistrate Judge Ramirez without delay.

## CONCLUSION

It is after considered deliberation that the Court has determined that the District failed to provide Leah a free appropriate public education and that the District is obligated to reimburse her parents for those reimbursable costs incurred after June 2, 2004. Defendants' Motion for Judgment on the Record is therefore **GRANTED IN PART**, and **DENIED** as to the exception to the statutory notice requirement of the IDEA, and the District's Motion for Final Judgment is **DENIED**. Additionally, the District's Motions to Strike are **DENIED**.

   **SO ORDERED**.

   August 21, 2007.

      *Barbara M.G. Lynn*
      **BARBARA M.G. LYNN**
      **UNITED STATES DISTRICT JUDGE**
      **NORTHERN DISTRICT OF TEXAS**