**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RICHARDSON INDEPENDENT | § | |
| SCHOOL DISTRICT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:05-CV-535-M |
| | § | |
| MICHAEL Z. and CAROLYN Z., as next | § | |
| friends of LEAH Z., a minor child, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motion Regarding Reimbursement of Non-Medical Costs for Defendant's Residential Placement ("Motion Regarding Reimbursement"), and Motion for Attorney's Fees. The Motion for Attorney's Fees was referred to Magistrate Judge Irma C. Ramirez, and timely objections to the Magistrate Judge's Findings, Conclusions, and Recommendations ("Findings") were filed by both parties. Defendants' Motion Regarding Reimbursement is **GRANTED** in part, and **DENIED** in part. The Court awards attorney's fees, but reduces the hours subject to reimbursement to account for counsel's failure to demonstrate billing judgment and her work on non-reimbursable matters.

## STATEMENT OF FACTS

This case concerns the education of Leah Z., a minor child at all relevant times, and the steps taken by the Richardson Independent School District ("District") to provide her a free appropriate public education, as required by the Individuals with Disabilities Act ("IDEA"). The Court shall refer to Leah by her first name and to her parents—Michael Z. and Carolyn Z.—as

Defendants. The District is the Plaintiff, and Leah's parents are the Defendants, because the District appealed the decision of the Hearing Officer at Leah's administrative due process hearing ("Hearing"). The record in this case, which the Court has reviewed in considering Defendants' Motions, is substantial. Aspects of the procedural history relevant to the pending Defendants' Motions are summarized here.

In its Memorandum Opinion and Order of August 21, 2007 ("Opinion"), the Court determined that the District failed to provide Leah a free appropriate public education, and that Leah's joint placement at the Texas NeuroRehab Center ("TNRC"), a private residential facility, and the University Charter School ("UCS"), a public school, was appropriate. In its Opinion, the Court directed Defendants to identify all reimbursable services provided by TNRC between June 2, 2004 and November 12, 2004. In their Motion, Defendants seeks reimbursement for room and board, and nursing, therapeutic, and diagnostic services provided by TNRC.

In her Findings, entered on February 1, 2008, Judge Ramirez recommended reducing the fee award by fifty-percent to reflect Defendants' partial monetary recovery and counsel's failure to demonstrate billing judgment. Timely objections to Judge Ramirez's recommendations were filed by both parties.

## REIMBURSEMENT OF NON-MEDICAL COSTS

Defendants seek reimbursement for a wide variety of services provided by TNRC, including room and board, comprehensive therapy, nursing services, and laboratory tests. Before analyzing which, if any, of these services are reimbursable, the Court addresses a general limitation on reimbursement urged by Plaintiff.

Plaintiff contends that only services described in Leah's Individual Education Program ("IEP") are reimbursable. The IEP, a written academic program developed to address a child's

unique disabilities, is jointly prepared by a representative of the school district, a teacher, and the child's parents. Plaintiff relies on 20 U.S.C. § 1401(9), which defines free appropriate public education as special education and related services "provided in conformity with the [child's] individualized education program." Plaintiff contends that this restriction equally applies to hybrid placements, in which a student is jointly enrolled in a public and a private institution. If Section 1401(9) applies to Leah's placement at TNRC and UCS, only services specifically included in Leah's IEP are reimbursable.

In its Opinion, the Court determined that an identical legal standard governs private and hybrid placements. The Supreme Court has held that private placements are exempt from Section 1401(9), which defines the requirements of a "free appropriate *public* education."[1] Thus, services provided in a private residential setting that are necessary to enable a child to benefit from special education are reimbursable, notwithstanding their omission from the child's IEP. As the Supreme Court explained in *Florence County School District v. Carter*:

> This case presents the narrow question of whether Shannon's parents are barred from reimbursement because the private school in which Shannon enrolled did not meet the § 1401(a)(18) definition of "free appropriate public education." We hold that they are not, because § 1401(a)(18)'s requirements cannot be read as applying to parental placements. . . . § 1401(a)(18)(D) requires schools to provide an IEP, which must be designed by a 'representative of the local educational agency,' and must be 'established,' 'revised,' and 'reviewed' by the agency. These requirements do not make sense in the context of a parental placement. In this case, as in all *Burlington* reimbursement cases, the parents' rejection of the school district's proposed IEP is the very reason for the parents' decision to put their children in a private school. . . . [T]o read the § 1401(a)(18) requirements as applying to parental placements would effectively eliminate the right of unilateral withdrawal recognized in *Burlington*. Moreover, the IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. To read the provisions of § 1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose.[2]

---

[1] 20 USC § 1401(9); *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 9-10 (1993).
[2] 510 U.S. at 13-14 (internal citations omitted).

Because the holding in *Carter* also governs hybrid placements, 1401(9) is inapplicable to Leah's enrollment in TNRC and UCS. Thus, Defendants may obtain reimbursement for services provided by TNRC that were not included in Leah's IEP.

Having disposed of Plaintiff's threshold objection, the Court next determines the specific services for which reimbursement is available.

*Room and Board*

Defendants seek reimbursement for Leah's room and board at TNRC between June 2, 2004 and November 12, 2004. Reimbursement of room and board is available when a child's placement at a private residential program is "necessary to provide special education and related services to a child."[3]

Plaintiff's principal contention is that Leah's placement at TNRC was not necessary under Section 1401(9). In its Opinion, the Court rejected this argument, determining that Section 1401(9) was inapplicable to Leah's hybrid placement at TNRC and UCS. Plaintiff does not offer any new arguments or authority for its position and, therefore, its objection is denied.

Alternatively, Plaintiff argues that Leah's placement at TNRC was improper under the standard applicable to private placements. As the Fifth Circuit held in *Alamo Heights Independent School District v. State Board of Education*, private placements are governed by a more permissive standard than are public placements: "[r]eimbursement will be permitted under *Burlington* when unilateral placement by parents [in a private setting] is generally found to be appropriate, even though it is not 'the exact proper placement required under the Act.'"[4] As proof that the TNRC was not an appropriate placement for Leah, Plaintiff emphasizes her aggressive and uncooperative behavior after admission to TNRC. Further, Plaintiff argues that it was not

---
[3] 34 C.F.R. § 300.104.
[4] 790 F.2d 1153, 1161 (5th Cir. 1986).

TNRC's structured environment that contributed most to Leah's improved behavior in the late summer of 2004, but rather the prescription of Clozaril. Identical arguments were considered and rejected by the Court in its earlier Opinion. Because TNRC was an appropriate placement for Leah, Defendants are entitled to reimbursement for her room and board at TNRC between June 2, 2004 and November 12, 2004.

*Comprehensive Therapy Services*

Defendants also seek reimbursement for comprehensive therapy services, including individual, family, and group psychological therapy, and occupational, recreational, speech, and other therapy received by Leah at TNRC between June 2, 2004 and November 12, 2004. Plaintiff levels a procedural and a substantive objection to reimbursement of these costs. The procedural objection is that the evidence establishing the number of hours of therapy received by Leah is inadmissible. The substantive objection is that the therapeutic services provided did not serve an educational purpose and thus are not reimbursable.

The first issue is whether Defendants established by admissible evidence the number of hours of therapy received by Leah. Defendants introduced two pieces of evidence to substantiate these hours. First, Defendants submitted billing records detailing the number of "units" of therapy provided. All but five pages of these records were previously introduced at Leah's Hearing. Second, Defendants submitted an affidavit from Dr. Nilima Mehta, Leah's treating physician at TNRC, stating that a "unit" of service has a time equivalent of fifteen minutes.

Plaintiff moves to exclude the five pages of billing records, which were not previously introduced at either the Hearing or the additional evidence hearing held on October 4, 2006. Plaintiff's argument is meritless. The relevant records were appended as Exhibit 12 to Defendants' Motion Regarding Reimbursement, filed on September 12, 2007, and as Exhibit 3 to

Defendants' Re-filing of Authenticated Statements, filed with the Court's permission on March 4, 2008. Plaintiff first objected to the records' admissibility in its Response to Defendants' Re-filing of Authenticated Statements. Plaintiff does not identify any specific prejudice from Defendants' submission of the records in September of 2007. Plaintiff's objection is denied.

Plaintiff also objects to the admissibility of Dr. Mehta's affidavit specifying the time equivalent to a "unit" of service, contending Dr. Mehta lacked personal knowledge of the matter. In her affidavit, Dr. Mehta states that she had personal knowledge of the time equivalent of a "unit" of service. Plaintiff demands evidence substantiating Dr. Mehta's familiarity with TNRC's billing practices. Defendants respond that Dr. Mehta, a TNRC employee of four years and Defendants' treating physician at TNRC, was aware of the time equivalent of a unit of service, and Plaintiff provides no reasons for the Court to doubt Dr. Mehta's plausible assertion of that. Plaintiff's request to exclude Dr. Mehta's affidavit is thus denied.

Having disposed of Plaintiff's procedural arguments, the Court turns to Plaintiff's substantive objection—that the therapy provided to Leah did not confer an educational benefit and, therefore, is not reimbursable. The IDEA guarantees every child an appropriate education, including "special education and related services."[5] Related services include "developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education, and includes the early identification and assessment of disabling conditions in children."[6] The IDEA lists the following as examples of related services:

> speech-language pathology and audiology services, interpreting services, *psychological services*, *physical and occupational therapy, recreation, including therapeutic recreation*, social work services, school nurse services designed to enable a child with a disability to

---

[5] 20 U.S.C. § 1401(9). As discussed, § 1401(9)'s requirements are not strictly applicable to hybrid placements. However, federal regulations interpreting § 1401(9) have presumed that its guarantee of "special education and related services" is equally applicable to private placements and, therefore, hybrid placements. *See* 34 C.F.R. § 300.104.
[6] 20 U.S.C. § 1401(26)(a).

receive a free appropriate public education as described in the individualized education program of the child, *counseling services*, including rehabilitation counseling, orientation and mobility services, and medical services.[7]

A federal court has broad discretion to define the services "required to assist a child with a disability to benefit from special education."[8] The determination of reimbursable services should be made in light of the IDEA's central purpose— to provide handicapped children with an appropriate education that "emphasizes special education and related services designed to meet their unique needs."[9]

Leah benefited behaviorally, emotionally, and academically from the counseling provided at TNRC. At the Hearing, the Hearing Officer determined, and this Court concurred in its Opinion, that Leah's academic difficulties were inextricably intertwined with her emotional and behavioral problems. The Court does not provide an exhaustive recital of the arguments and evidence previously presented, but rather distills the key facts. Leah suffered from numerous debilitating conditions, including bipolar disorder, separation anxiety disorder, oppositional defiant disorder, attention deficit hyperactivity disorder, and pervasive developmental disorder. Defiant and aggressive, Leah lashed out at teachers, skipped class, and was generally unreceptive to instruction. Repeated outbursts also limited her ability to focus, to absorb lessons, and to complete assignments in a timely manner. As a result, Leah struggled academically in the approximately twelve schools she attended. The Court finds persuasive the district court's analysis of an identical issue in *Township of Bloomfield Board of Education v. S.C.*:

> T.M.'s psychiatric stabilization is a necessary part of his educational program. This is a continuing, interrelated process in which his psychological difficulties and his education

---

[7] *Id.* (emphasis added).

[8] 20 U.S.C. § 1401(a)(8); 20 U.S.C. §1415(e)(2) ("[T]he court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."); s*ee Sch. Comm. of Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).

[9] *Id.; Burlington*, 471 U.S. at 369.

continue in tandem. While medical doctors and psychiatrists may diagnose and evaluate T.M. and aides may provide continuing counseling and monitoring, it is part of an educational process. Without the diagnosis and evaluation and without the counseling and monitoring the educational process could not take place.[10]

Similarly, Leah's doctors recognized that extensive counseling was critical to treat the psychological and behavioral problems underlying her academic difficulties.

To develop a therapy regimen tailored to Leah's unique emotional and behavioral needs, TNRC first conducted numerous diagnostic tests, including psychiatric, educational, vocational, motor impairment, therapeutic recreation, occupational therapy, and speech-language evaluations. Based on Leah's test results, Dr. Mehta developed a comprehensive program "to control the behaviors and improve overall emotional functions and also oral functioning in the school setting, home setting, and outside in the community." Leah's therapy regimen included individual, family, and group psychological therapy, and recreational, occupational, and speech, therapy. Dr. Mehta concluded that counseling and therapy sessions were instrumental to Leah's academic progress.

The Court also draws guidance from the Second Circuit's decision in *Mrs. B v. Milford Board of Education*.[11] There, the student suffered from debilitating social, emotional, and behavioral problems, which "seriously affected" her ability to learn and "le[d] to regressive behaviors, disinhibition of impulses, loss of contact with reality, and confused thought processes."[12] The Second Circuit approved reimbursement of "intensive therapy services" and behavioral modification techniques to address the underlying emotional and psychological problems hampering the student's academic progress.[13] Here, because intensive therapy was equally critical to enable Leah to benefit from special education, Defendants are entitled to

---

[10] No. Civ. 04-3725, 2005 WL 2320029, *10 (D.N.J. Sept. 22, 2005).
[11] 103 F.3d 1114 (2nd Cir. 1997).
[12] *Id*. at 1116.
[13] *Id*. at 1118.

reimbursement for occupational, recreational, and speech therapy, and individual, group, familial and other therapy provided to Leah by TNRC between June 2, 2004 and November 12, 2004.[14]

*Nursing Services*

Defendants seek reimbursement for "Intensive Nursing Care" and an "Intensive Nursing Care Increment" provided to Leah. The IDEA provides for reimbursement of health services and school nurse services necessary to enable a child with a disability to benefit from special education.[15] Here, the nursing regimen, developed after extensive testing and evaluation of Leah, was part of an integrated approach to managing Leah's psychiatric and behavioral problems and improving her classroom function. Accordingly, Defendants are entitled to reimbursement for nursing services provided by TNRC.

*EKG / ECG Tests & Laboratory Diagnostics*

Defendants seek reimbursement for laboratory diagnostics and EKG / ECG tests performed by TNRC. Although the IDEA and its interpretive regulations do not specifically authorize reimbursement for EKG / ECG tests, they broadly permit reimbursement for non-medical services required to enable a child with disability to benefit from special education.[16] "Medical services," on the other hand, are only reimbursable if they confer an educational benefit *and* are for diagnostic or evaluation purposes.[17] The Supreme Court has narrowly defined medical services to embrace only services that must be performed by a licensed physician.[18] Plaintiff asserts, without contradiction, that the laboratory diagnostics and EKG / ECG tests provided here were non-medical services. The relevant issue, therefore, is whether these tests were required to enable Leah to benefit from special education.

---

[14] 20 U.S.C. § 1401(a)(8).
[15] 20 U.S.C. § 1401(26)(a); 34 CFR 300.34(a).
[16] 20 U.S.C. § 1401(26)(a).
[17] *Id.*; 34 CFR 300.34(a).
[18] *Cedar Rapids Community School District v. Garret F.*, 526 U.S. 66, 73-74 (1999).

Before addressing the substantive issue presented, the Court overrules Plaintiff's procedural objection that Dr. Mehta's affidavit is inadmissible because she lacks personal knowledge of the purpose of the lab diagnostics. To the contrary, the Court concludes that Dr. Mehta, Leah's treating physician at TNRC, grasped Leah's condition and the purpose for the relevant lab tests.[19]

The Court now addresses Plaintiff's substantive objection—that the lab diagnostics did not confer an educational benefit to Leah. In her affidavit, Dr. Mehta identifies two categories of lab diagnostics administered: the tests were conducted "either for purpose of a neurological diagnostic workup or as diagnostic tools to monitor blood levels while various psychotropic medications and/or combinations of psychotropic medications were prescribed for Leah to control her behaviors."[20] The first category of tests —neurological diagnostics—identified potential causes of Leah's behavioral difficulties, including thyroid problems, anemia, autoimmune disorders, and other neurological conditions presenting as psychiatric problems. By enabling more precise diagnosis of Leah's behavioral and emotional disorders, neurological tests enabled TNRC to develop an effective treatment regimen to improve Leah's function in the classroom. Because the first category of tests, administered between June 2 and July 8 of 2007, was required to enable Leah to benefit from a special education program, Defendants' expenditures for these tests are reimbursable.

The second category of tests—blood diagnostics— was administered while Leah was taking Clozaril and Lithium. The tests, performed between August 20 and October 12 of 2007, were used to evaluate potential side effects from these drugs, including liver and kidney problems, hypothyroidism, and changes in Leah's white blood and neutrophil counts. The

---

[19] A.R. Vol. III, pp. 397-401.
[20] Aff. of Nilima Mehta, M.D., ¶ 4.

connection between these tests, designed to avoid harmful side effects from Leah's medications, and Leah's academic progress is too tenuous to justify their classification as "related services." Thus, Defendants' expenditures for blood diagnostics are not reimbursable.

Finally, Defendants have not met their burden of demonstrating an educational benefit from the administration of EKG / ECG tests. Defendants do not identify the nature or purpose of these tests, making it impossible for the Court to conclude that they were necessary to enable Leah to benefit from special education.

Thus, Defendants are entitled to reimbursement for room and board, neurological diagnostics, and therapeutic and nursing services provided to Leah between June 2, 2004 and November 12, 2004.

*Calculation of Reimbursement*

(1) Adjustments to Charges

The Court now determines the specific amount of reimbursement to which Defendants are entitled. Between June 2, 2004 and November 12, 2004, the total invoices ("gross total charges") for all services provided by TNRC to Leah were $171,761.38. However, Defendants' insurance carrier, Blue Cross / Blue Shield ("BCBS"), negotiated an adjusted rate for the complete package of services provided to Leah by TNRC. Between June 2, 2004 and June 24, 2004, the adjusted rate for these services was $360.00 per day. Between June 25, 2004 and November 12, 2004, a variable daily rate was negotiated by BCBS. Because of these negotiated rates, the *actual* total amount charged to Defendants between June 2, 2004 and November 12, 2004 was $57,280—substantially less than the $171,761.38 in gross charges.

The Court deducts from the actual total charges Defendants' expenditures for four items: pharmaceutical drugs and a respiratory inhalation study, which the parties agree are not reimbursable, blood diagnostics, and EKG / ECG tests.

The Court first addresses the appropriate deductions for the pharmaceutical drugs and the respiratory inhalation study. In making these deductions, the Court utilizes the actual, rather than the invoiced, charges for these items, based on the adjusted rates negotiated by BCBS. Because BCBS did not negotiate rates for specific, individual services, but rather a package rate for *all* services provided, an additional step is necessary to determine the actual charges for pharmaceutical and inhalation services. To determine the actual charges for these items, the Court first calculates the fractional proportion of the total gross charges represented by the pharmacy charges and the respiratory charges, respectively. Next, the Court multiplies the resulting ratios by the gross pharmacy and gross respiratory charges to arrive at the actual pharmacy and actual respiratory charges, respectively.

The calculations described above are partially reflected in Exhibit 13 to Defendants' Motion Regarding Reimbursement, a spreadsheet generated from billing records that were either introduced at the Hearing or appended to the Motion Regarding Reimbursement. Exhibit 13 includes calculations of the following: (1) the ratio of gross pharmacy and gross respiratory charges, respectively, to the total gross charges for each two-week session that Leah was at TNRC; (2) the actual charges for pharmacy and respiratory services, obtained by multiplying these ratios by the gross pharmacy and gross respiratory charges, respectively; and (3) the total

amount of reimbursement owed, determined by subtracting the actual pharmacy charges

($317.02)[21] and actual respiratory charges ($141.35) from the actual total charges ($57,280).

The Court next calculates the appropriate deductions for Defendants' expenditures on

blood diagnostics and EKG / ECG tests. Because Defendants do not provide the actual charges

for these items, the Court utilizes the invoiced amounts. The invoices for EKG / ECG tests and

blood diagnostics totaled $159.84[22] and $637.60,[23] respectively. After deducting these amounts,

as well as the actual charges for pharmacy services ($317.02) and the respiratory study

($141.35), the total reimbursable charges are **$56,024.19**.

Plaintiff objects to these calculations on four grounds. First, Plaintiff urges that Exhibit

13, a spreadsheet prepared by Defendant Carolyn Z., is not "direct evidence." Second, Plaintiff

notes that the gross pharmacy and gross inhalation costs for each two-week session, which are

summarized in Exhibit 13, do not itemize the individual pharmacy and inhalation services

provided. Third, Plaintiff objects that the gross, rather than the actual, charges for pharmacy and

respiratory services should be deducted from the total actual charges. Fourth, Plaintiff urges that

Defendants incorrectly calculated room and board costs between June 2, 2004 and June 10, 2004.

Plaintiff's fourth objection is meritorious; the others are overruled.

Plaintiff's first objection—that Exhibit 13 is not "direct evidence"—is unpersuasive.

Exhibit 13 merely summarizes billing records previously admitted at the Hearing or appended to

---

[21] Exhibit 13 indicates that actual pharmacy charges are $243.30. Defendants' calculation of actual pharmacy charges, however, assumed gross total charges of $8,781.60 between June 2, 2004 and June 10, 2004. As discussed further below, the total gross charges assumed for this period rely on an incorrect calculation of room and board costs and, therefore, are wrong. Using the correct gross total charge of $5,231.60 for this time period yields an actual pharmacy charge of $91.17, $36.86 greater than the $54.31 calculated by Defendants for this period. The Court accordingly increases the total actual pharmacy charges between June 2 and November 12, 2004 from $280.16 to $317.02.
[22] The specific invoiced amounts are described in the Motion Regarding Reimbursement, which contains citations to the relevant billing records.
[23] The specific invoiced amounts are summarized in Exhibit 1 to Defendants' Statement of the Nature and Purpose of Laboratory Tests.

Defendants' Motion Regarding Reimbursement. The simple mathematical calculations reflected in the spreadsheet are readily verifiable, and Plaintiff does not allege any computational errors, other than the single miscalculation addressed below. Plaintiff's second objection—that Exhibit 13 does not itemize the individual pharmacy and inhalation services provided in each two-week session— is similarly unavailing. The itemized costs are included in the billing records appended as Exhibits 1 through 12 to Defendants' Motion Regarding Reimbursement. Plaintiff's third objection is that the gross charges, rather than the actual charges, for pharmacy and respiratory services should be deducted from the total actual charges. However, the gross charges do not reflect the rates negotiated by BCBS and, therefore, are not an accurate statement of the charges actually incurred. Further, because the Court utilizes the negotiated rates to calculate reimbursement for "related services," consistency also requires using the negotiated rates to calculate the appropriate deduction for pharmacy and inhalation services.

Plaintiff's final objection is that Defendants made a mathematical error in calculating the gross room and board charges between June 2, 2004 and June 10, 2004. Defendants state that the gross room and board charges for this period are $9,940. Defendants arrived at this amount by multiplying the pre-adjusted, *per diem* cost of room and board ($710) by nine days. Plaintiff, however, correctly observes that multiplying $710 by nine yields a product of $6,390, not $9,940—a difference of $3,550 (which is the additional days). The Court adjusts this difference to reflect the negotiated billing rate between June 2 and June 10, 2004. After making the appropriate adjustment, the actual total charges between June 2 and June 10, 2004 are reduced from $3,240 to $1,930.22— a difference of $1,309.78. After deducting $1309.78 from the total reimbursement amount of $56,024.19 determined above, the Court finds that Defendants are entitled to $**54,714.41**.

<u>Reduction in Lifetime Insurance Benefits</u>

Defendants also seek reimbursement for the amount by which their lifetime health insurance benefits were reduced as a result of Leah's residential placement. BCBS paid TNRC benefits of $9,179.58. However, Defendants' damages from the reduction in their lifetime benefits are too speculative to warrant reimbursement. Although Defendants' lifetime health insurance benefits have been reduced as a result of Leah's placement, this reduction would only cause Plaintiff actual losses to the extent that (1) benefits-triggering events occur in the future, and (2) because of the $9,179.58 previously paid by BCBS, these events result in benefit payments exceeding the applicable policy limit. The Court has insufficient information to evaluate the probability of these contingencies. Defendants have not introduced any evidence regarding the nature or scope of Defendants' health benefits, the total benefits paid to Defendants to date, or Defendants' policy limit. Thus, the Court denies Defendants' request for reimbursement of the $9,179.58 paid by BCBS.

## ATTORNEY'S FEES

In its Opinion of August 21, 2007, the Court awarded Defendants reasonable attorney's fees and costs, and referred the specific fee amount to which Defendants are entitled to Magistrate Judge Irma C. Ramirez for findings and recommendations. Defendants requested $65,798.22 in attorney's fees. Judge Ramirez's Findings, filed on February 1, 2008, recommended granting Defendants' Motion for Attorney Fees and Costs in part, and awarded Defendants $20,292 as reasonable attorney's fees and $1,168.20 as costs. Timely objections to these recommendations were filed by the parties.

*Standard of Review*

Under 28 U.S.C. § 636(b)(1)(B), a magistrate judge's recommendation regarding attorney's fees is subject to de novo review by the district court, which may accept, reject, or modify the magistrate judge's recommendation.[24]

*Methodology for Calculation of Attorney's Fees*

The Fifth Circuit interprets the IDEA's attorney's fees provision in accordance with *Hensley v. Eckerhart*, 461 U.S. 424 (1983). Under *Hensley*, a prevailing party may recover only those fees that are reasonably expended on the litigation.[25]

In adjudicating an attorney's fees award, a court first calculates a "lodestar" fee by multiplying the reasonable number of hours expended on the case by the reasonable hourly rates for the participating lawyers.[26] The fee applicant bears the burden of proof on this issue.[27] In the second step of the lodestar method, a court must consider whether the lodestar figure should be adjusted upward or downward depending on its analysis of the twelve factors established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).[28] Many of these factors are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate, and should not be double-counted.[29] The most critical factor in determining the reasonableness of an attorney's fee award is the degree of success obtained.[30]

---

[24] 28 U.S.C. § 636(b)(1)(B).
[25] *See* 461 U.S. at 433-34; *Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993).
[26] *See Hensley*, 461 U.S. at 433; *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995).
[27] *See Riley v. City of Jackson, Miss.*, 99 F.3d 757, 760 (5th Cir. 1996); *Kellstrom*, 50 F.3d at 324.
[28] The twelve factors are: (1) the time and labor required for the litigation; (2) the novelty and difficulty of the questions presented; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the result obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Cobb v. Miller*, 818 F.2d 1227, 1231 n.5 (5th Cir. 1987) (citing *Johnson*, 488 F.2d at 717-19).
[29] *Jason D. W. v. Houston Ind. Sch. Dist.*, 158 F.3d 205, 209 (5th Cir. 1998) (internal citations omitted).
[30] *Hensley*, 461 U.S. at 436.

*Calculation of the Lodestar*

The first step in the lodestar analysis requires the court to determine the reasonable number of hours expended by Defendants' attorney on the lawsuit, as well as her reasonable hourly rate. Defendants offer time records and affidavits in support of their application.

<u>Reasonable Number of Hours</u>

Defendants present two different totals for the number of hours expended on the lawsuit. The Motion states that counsel spent 328.99 attorney hours on the Hearing and appeal to the District Court. In her sworn affidavit, however, counsel states that she spent 292.5 hours defending the case. The record contains no explanation for the discrepancy between the two figures. The Court utilizes the 292.5 hours provided in the sworn affidavit.

Judge Ramirez excluded approximately twenty-five percent of the hours requested based on counsel's failure to demonstrate billing judgment. Additionally, Judge Ramirez excluded hours expended on unrelated matters and Defendants' unsuccessful Motion for Summary Judgment. Defendants objected to these exclusions and the twenty-five percent reduction.

*(1) Hours Expended on Non-Reimbursable Items*

Plaintiff seeks to exclude hours expended on two non-reimbursable matters: (1) the Admission, Review and Dismissal ("ARD") committee meetings, and (2) a "motion for release." 10.08 and 3.75 hours were expended by counsel on the ARD meeting and the motion for release, respectively. Judge Ramirez appropriately excluded, without objection, the **13.83 hours** expended on these matters.

*(2) Hours Expended on Unsuccessful Motions*

Hours expended on unsuccessful motions, claims, or issues should be excluded. As the Supreme Court instructed in *Hensley v. Eckerhart*, "In some cases a plaintiff may present in one

lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, . . . counsel's work on an unsuccessful claim cannot be deemed to have been 'expended in pursuit of the ultimate result achieved'" and, therefore, "no fee may be awarded for services on the unsuccessful claim. . . ."[31] Here, Plaintiff seeks to exclude hours expended by counsel on Defendants' unsuccessful Motion for Summary Judgment. Judge Ramirez excluded all hours expended on the Motion.

In its earlier Opinion, the Court denied Defendants' Motion for Summary Judgment, determining that the IDEA entitled Plaintiff to present additional briefing on the specific services subject to reimbursement. Defendants argue that complete reimbursement is nonetheless appropriate, because the Court denied the Motion on procedural grounds, rather than on the merits. Defendants cite no authority for their position. In any event, the basis for the Court's denial of the Motion does not govern reimbursement—the results are key.[32] Here, the Court denied Defendants' Motion and, as a result, Plaintiff was entitled to submit additional evidence and briefing on the reimbursement issue. Consistent with Judge Ramirez's recommendation, the Court excludes the **74.5 hours** expended by counsel on the Motion for Summary Judgment and Reply Brief.

*(3) Excessive, Duplicative, Unspecified Entries and Failure to Demonstrate Billing Judgment*

The Plaintiff alleges that Defendants violated Judge Ramirez's fee application instructions. Specifically, Plaintiff contends that multiple billing entries are duplicative, vague, and contain improper redactions, making it impossible for Plaintiff to determine whether counsel's expenditure of time was reasonable. Further, Plaintiff argues that Defendants did not

---

[31] *Id.* at 434-35.
[32] *See id.* at 434.

introduce evidence of appropriate billing judgment. Finding Plaintiff's objections meritorious, the Court accepts Judge Ramirez's recommendation of a twenty-five percent reduction in the reimbursable hours incurred by Defendants' counsel.

**(a) Vague Entries and Improper Redactions**

Only hours reasonably spent by counsel are reimbursable.[33] The fee applicant has the burden to submit adequate documentation of the hours reasonably expended.[34] To enable meaningful review by the Court, a billing entry should contain a short but thorough description of the services rendered.[35] District courts enjoy broad discretion to exclude or reduce hours based on insufficient documentation or vague entries in the billing records.[36] Examples of entries determined to be too vague and brief to inform the Court precisely what work was done include "research and review of cases," "review and revise brief," "review of materials," and "legal research re 5th Circuit issues."[37] Accordingly, Judge Ramirez's Order directed counsel that entries must be sufficiently specific to demonstrate the work was performed on the case at bar, and that "Entries reflecting only "Research re," "Conference re," "Legal research re," and "Drafting re" are insufficient. Applicants submitting a vague or incomplete application, therefore, clearly "take their chances" that the district court will reject or reduce the fee award.[38]

Here, scores of billing entries were inadequately detailed. These entries related to four categories of activities: (1) legal research; (2) meetings, consultations, and telephone calls with the client and witnesses; (3) motion drafting; and (4) hearing preparation. Counsel's entries related to legal research generally identify the motion to which the research relates, but fail to

---

[33] *Id.* at 434.
[34] *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 822 (5th Cir. 1997).
[35] *League of United Latin American Citizens #4552 v. Roscoe Ind. Sch. Dist.*, 119 F.3d 1228, 1236 (5th Cir. 1997).
[36] *Id.* at 1233.
[37] *Id.*; *see also Hopwood v. State of Texas*, 999 F.Supp. 872, 916 n.93 (W.D.Tex. 1998), *rev'd on other grounds* 236 F.3d 256 (5th Cir. 2000).
[38] *Kellstrom,* 50 F.3d at 326-27.

describe the issues researched, making it impossible for the Court to determine whether counsel's effort was reasonable. Billing entries describing consultations with the client frequently fail to specify the purpose of the meeting, precluding meaningful review. "Office consultation" is a typical description. Summaries of counsel's work on motions and hearings are similarly sparse, failing particularly to describe the tasks performed. "Reviewed documents" and "reviewed file" are illustrative examples.

Plaintiff also seeks to exclude several redacted billing entries. Judge Ramirez expressly directed Defendants to submit "[a]ll relevant unredacted time entries." Defendants, however, redacted portions of the descriptions associated with multiple billing entries, in contravention of Judge Ramirez's Order.

### (b) Billing Judgment

Counsel is required to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary.[39] "Ideally, billing judgment is reflected in the fee application, showing not only hours claimed, but also hours written off."[40] In concluding that Defendants failed to meet their burden of establishing billing judgment, Judge Ramirez emphasized that the Defendants did not set forth specific facts establishing billing judgment, or identify any matters on which the number of billable hours was reduced to reflect a reasonable expenditure of time. To the contrary, counsel merely recharacterized simple administrative tasks as "clerical" in the billing records and accordingly reduced the billing rate. After noting counsel's failure to adduce any affirmative evidence of billing judgment, Judge Ramirez underscored facts demonstrating a *lack* of billing judgment, including dozens of vague billing entries and improperly redacted

---

[39] *Henlsey*, 461 U.S. at 434.
[40] *Alberti*, 896 F.2d at 930; *see Leroy v. City of Houston,* 831 F.2d 576, 585 n.15 ("[T]he billing records are completely devoid of any hours written off.").

items. Consistent with Judge Ramirez's recommendation, the Court finds that Defendants failed to meet their burden of demonstrating billing judgment.

(c) **Across-the-Board Reduction**

To substitute for the exercise of billing judgment, and to determine a reasonable expenditure of hours in light of the counsel's multiple violations of her Order, Judge Ramirez recommended a twenty-five percent, across-the-board reduction in the hours expended. The Fifth Circuit approved such an approach in *Walker v. U.S. Department of Housing & Urban Development*[41] and *Hopwood v. State of Texas.*[42] In *Hopwood*, the Fifth Circuit concluded that the district court did not abuse its discretion in ordering a flat, twenty-five percent reduction in attorney's hours when counsel exhibited poor billing judgment, by performing hours of duplicative and unnecessary work, expending time on non-reimbursable items, and insufficiently detailing work performed on certain motions. In *Hopwood*, the district court observed, "It was impractical for the Court to wade through literally hundreds of time entries in order to assess a specific number of duplicative and excessive hours for each attorney."[43] Similarly, in *Walker*, the Fifth Circuit ordered a flat, fifteen percent reduction when counsel did not introduce sufficient evidence of billing judgment: "The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment."[44] Here, Defendants' similar failure to adduce sufficient evidence of billing judgment, coupled with Defendants' countless incomplete, vague, and redacted entries, warrants an across-the-board reduction. The Court thus accepts Judge Ramirez's recommendation of a flat, twenty-five percent reduction in the number of reimbursable hours.

---

[41] 99 F.3d 761, 770 (5th Cir.1996) ("The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment.").
[42] 236 F.3d 256.
[43] *Hopwood*, 999 F. Supp. at 916.
[44] *Walker*, 99 F.3d at 770.

<u>Reasonable Rate</u>

Judge Ramirez found that counsel's hourly rate of $200 for hearing and prehearing work, which was consistent with the prevailing market rate, was reasonable. Plaintiff objects that Judge Ramirez's determination of the prevailing market rate was not supported by sufficient evidence.

The reasonable hourly rate is determined based on the prevailing market rate in the relevant legal community.[45] The applicant bears the burden of establishing by satisfactory evidence the prevailing market rate.[46] When an attorney's customary hourly rate is within the range of hourly fees in the prevailing market, that rate should be considered in setting a reasonable hourly rate.[47]

Here, Judge Ramirez concluded that counsel's hourly rate of $200 for pretrial and trial work was consistent with the prevailing market rate for attorneys with similar qualifications, experience, and reputation practicing special education law. The Court concludes that Judge Ramirez's determination was supported by sufficient evidence, including Judge Ramirez's (and this Court's) knowledge of rates charged for legal services, her experience in setting attorney's fees in other cases, and counsel's own affidavit, which indicated that $200 per hour was customary for attorneys of similar experience and ability.

Plaintiff responds that the prevailing market rate must be established by "evidence in addition to [the] attorney's own affidavits."[48] Here, Judge Ramirez's knowledge of rates charged for legal services and experience in setting attorney's fees constituted adequate, additional evidence. Further, Defendants submitted the affidavits of two attorneys, Susan F. Heiligenthal and Dorene J. Philpot, who were not involved in the litigation, to substantiate the prevailing

---

[45] *Blum v. Stenson*, 465 U.S. 886, 895 (1984).
[46] *Washington v. Philadelphia County Court of Common Pleas*, 89 F.3d 1031, 1035 (3rd Cir. 1996).
[47] *League of United Latin American Citizens No. 4552*, 119 F.3d at 1234.
[48] *Blum*, 465 U.S. at 895 n.11.

market rate. These affidavits, which were not relied on by Judge Ramirez, attest to the prevailing rate charged by attorneys with similar skill, experience, and reputation practicing special education law. In her affidavit, Ms. Heiligenthal attests that she exclusively represents parents of children with special educational needs and charges $175 and $225 for prehearing and trial work, respectively, and that her fees are comparable to those of other special education attorneys in Texas. Similarly, Ms. Philpot's affidavit indicates that her hourly rate of $200 and $250 for prehearing and trial work, respectively, in special education cases conforms to the prevailing market rate.

Plaintiff levels a procedural and a substantive objection to these affidavits. The procedural objection is that the affidavits must be excluded because Defendants did not timely designate Ms. Philpot and Ms. Heiligenthal as expert witnesses. It is undisputed that the Defendants failed to designate either attorney as an expert witness by November 3, 2005, as required by the Court's Scheduling Order, entered on October 25, 2005. However, the Court rejects Plaintiff's objection, finding Judge Fitzwater's analysis of an identical issue persuasive:

> Scheduling disputes concerning attorney's fee matters are addressed by this court under a standard that is more flexible than that which applies in other contexts. This is true primarily because attorney's fee requests are typically handled by post-judgment motion, and because these claims are by nature less likely to present issues of undue surprise, since the attorneys in the case are themselves usually experts with regard to fee claims. . . . [I]n the attorney's fee context, the court discerns no undue prejudice from permitting the designation of Eggleston as an attorney's fee expert." [49]

Here, Plaintiff's objection is particularly unpersuasive because Plaintiff does not identify any prejudice from Defendants' untimely designation of Ms. Philpot and Ms. Heiligenthal as experts.

---

[49] *Greystone Realty Corp. v. Eckland Consultants, Inc.*, No. 3:96-CV-0237-D, 1997 WL 30903, *1 (N.D.Tex. 1997) (unreported)(internal citation omitted).

Thus, Ms. Philpot and Ms. Heiligenthal's affidavits are admissible to establish the prevailing market rate.

Plaintiff's substantive objection is that the affidavits address the prevailing rate for attorneys statewide rather than in Dallas, the relevant legal market. However, Ms. Philpot attested, without contradiction, that there are fewer than ten attorneys in the entire state of Texas who primarily represent disabled children in special education proceedings, and that counsel's rate here was consistent with that charged by these attorneys for such proceedings. The Court concludes that counsel's hourly rate fell within the prevailing market rate, regardless of whether the relevant legal community is the city of Dallas or the State of Texas.

Accordingly, the Court accepts Judge Ramirez's finding that counsel's hourly rate fell within the prevailing market rate and was thus reasonable.

*Lodestar*

After consideration of the Plaintiff's objections and making an appropriate reduction to the requested hours, the Court finds that a reasonable number of hours times a reasonable hourly rate yields a lodestar of **$30,600**.[50]

*Adjustment to Lodestar Calculation*

The Court next considers whether the lodestar calculation should be adjusted in light of the four principal *Johnson* factors: (1) the time and labor involved; (2) the customary fee; (3) the amount involved and the results obtained; and (4) the experience, reputation, and ability of

---

[50] The Court arrives at this figure as follows: 292.5 – 88.58 in identified reductions (74.75 + 13.83) = 203.92 attorney hours. This sum is then reduced by 25%, based on counsel's failure to exercise billing judgment, to arrive at a total of 153 attorney hours reasonably expended, which is then multiplied by a rate of $200 per hour.

counsel.[51] Plaintiff argues that the third factor—Defendants' limited success—warrants a downward adjustment.

Judge Ramirez excluded twenty-five percent of counsel's total hours based on Defendants' partial success. Defendants sought reimbursement for Leah's placement at TNRC from April 1, 2004 through November 12, 2004, but only received an award of reimbursement for expenses incurred from June 2, 2004. Because Defendants only obtained reimbursement for 164 of 226 of the days requested (seventy-three percent), Judge Ramirez recommended a proportional reduction in the number of reimbursable hours.

The Court now addresses whether Defendants' degree of success warrants a complete fee award. In assessing a party's degree of success, the Court focuses on two key factors: whether counsel's expenditure of time was justified in light of the relief obtained,[52] and the relationship between the relief sought and the relief obtained.[53] The first factor, which focuses on the relationship between the relief obtained and the number of hours billed, addresses whether counsel's expenditure of time was reasonable in light of the results achieved.[54] Here, Defendants seek attorney's fees in the amount of $65,798.22 and have recovered $54,714.40 in non-medical costs, excluding pre- and post-judgment interest. The Fifth Circuit, which has approved attorney's fees "exceed[ing] the total monetary recovery," has not deemed a particular ratio of attorney's fees to damages as excessive *per se*.[55] In cases where the Fifth Circuit has concluded that the district court's fee award was excessive, the fee ratio presented was significantly larger than that found here. In *Migis v. Pearle Vision, Inc.*, for example, the district court awarded attorney's fees that were six and one-half times the damages awarded. There, Plaintiff also

---

[51] *Migis v. Pearle Vision, Inc.*, 135 F.3d 1047 (5th Cir. 1998).
[52] *Hensley*, 461 U.S. at 438.
[53] *See Migis*, 135 F.3d at 1041.
[54] *Hensley*, 461 U.S. at 436.
[55] *Branch-Hines v. Hebert*, 939 F.2d 1311, 1322 (5th Cir. 1991).

sought damages over twenty-six times the amount recovered.[56] Concluding that "these ratios are simply too large," the Fifth Circuit overturned the fee award. However, the ratio of attorney's fees sought to damages recovered here is 1.20—well within the range suggested by *Migis*, and smaller than that approved by other district courts in this circuit.[57]

Defendants' argument is also unpersuasive because *Migis* is distinguishable from the case at bar in two significant respects. First, the double-digit ratio of damages sought to damages awarded presented in *Migis* does not exist here, as discussed in greater detail below. Second, the Fifth Circuit has emphasized that a plaintiff's success is "not measured solely by monetary damages."[58] While the plaintiff in *Migis* obtained only monetary relief, Defendants also obtained a determination that Leah's public school placement was inappropriate, a crucial step in ensuring Leah's access to the necessary educational support and resources. Thus, the first factor does not warrant a downward adjustment of the fee award.

The second factor—the relationship between the relief sought and the relief obtained— also does not support a reduction of the fee award. The Supreme Court explained in *Hensley*, "A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole.[59] In assessing the extent of a party's success, the relationship between the damages sought and the damages obtained is a relevant consideration.[60] However, "[t]here is no precise rule or formula for making these [attorney's fee] determinations."[61] Because the trial judge is in the best position to grasp the scope and complexity of the litigation,

---

[56] 135 F.3d at 1047.

[57] *See Lewis v. Hurst Orthodontics, PA*, 292 F.Supp.2d 908 (W.D.Tex. 2003) (approving an attorney fee award of four times the settlement amount); *Williams v. City of Balch Springs*, o. 3:97-CV-1453-P, 1999 WL 1146802 (N.D.Tex. Nov. 17, 1999) (approving an attorney fee award of three times the settlement amount) (unreported); *Donihoo v. Dallas Airmotive, Inc.*, No. Civ.A. 3:97-CV-0109-P, 1999 WL 740692 (N.D.Tex. Sept. 15, 1999) (approving an attorney fee award of 3.7 times the settlement award) (unreported).

[58] *See Coleman v. Houston Indep. Sch. Dist.*, No. 98-20692, 1999 WL 1131554, *10 (5th Cir. 1999) (unpublished).

[59] *Hensley*, 461 U.S. at 440 (emphasis added).

[60] *Migis*, 135 F.3d at 1048.

[61] *Hensley*, 461 U.S. at 436.

a district court has broad discretion to determine reasonable attorney's fees.[62] Accordingly, a reduction in attorney's fees is not mandated because the applicant did not recover all of the monetary relief sought.

Here, Defendants were overwhelmingly successful. In proceedings before the Hearing Officer and this Court, Defendants sought a determination that Leah was denied a free appropriate public education, and that Leah's residential placement was appropriate under the IDEA. In both proceedings, Defendants prevailed on these crucial questions, which embraced multiple subsidiary issues. The Court's determination that Leah's joint placement at TNRC and the University Charter School ("UCS") was proper under the IDEA was particularly significant, because it involved a difficult question of first impression for the Fifth Circuit—whether a student's placement in a hybrid, public-private setting is governed by the standard applicable to private placements, or the more stringent standard applicable to public placements.

Plaintiff responds that Defendants only achieved limited success, since they did not prevail on their Motion for Summary Judgment, their counterclaims, and on whether Defendants properly notified Plaintiff of Leah's placement at TNRC. Hours expended by counsel on the Motion for Summary Judgment have already been excluded and, therefore, Defendants' lack of success on this issue does not warrant a further reduction of the fee award. Moreover, neither Defendants' counterclaims nor the notice issue figured prominently in the litigation. Defendants' counterclaims were first presented to the district court and were voluntarily dismissed by Defendants before trial. Indeed, the parties' submissions on the counterclaims were limited to the initial pleadings. The notice issue was similarly minor in relation to the litigation as a whole. The heart of the litigation, including the key factual and legal issues, centered on whether Plaintiff

---

[62] *Id.* at 436-37; *see also Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish Sch. Bd.*, 919 F.2d 374, 379 (5th Cir. 1990).

had provided Leah with a free appropriate education, and whether her placement at TNRC was appropriate under the IDEA. These overarching issues also presented the most complex legal questions, which Defendants' counsel skillfully litigated.[63] In contrast, the notice issue was straightforward and did not assume a central role in the litigation. This was reflected in the brief space devoted to the issue in the Court's opinion, occupying only two and a half of the Opinion's thirty-four pages. As the Fifth Circuit stated in *Taylor v. Sterrett*, "[T]he proper focus is whether the plaintiff has been successful on the central issue as exhibited by the fact that he has acquired the primary relief sought."[64] Thus, Defendants' failure to prevail on the notice issue did not diminish the significance of their success on the paramount issues in the case.

Plaintiff places great weight on the fact that Defendants only obtained approximately seventy-five percent of the monetary relief sought. Defendants' inadequate notice precluded reimbursement for Leah's placement at TNRC between April 1 and June 2, 2004 — approximately twenty-five percent of the total period that Leah was enrolled at TNRC. The Court rejects Plaintiff's argument for three reasons. First, there is no strict requirement of proportionality: the fee award need not be reduced to reflect the ratio of damages awarded to damages sought. To the contrary, the Supreme Court and the Fifth Circuit, eschewing a "precise rule or formula" for calculating attorney's fees,[65] have repeatedly rejected a strict proportionality requirement.[66]

Second, a plaintiff's partial recovery does not mandate a reduction in the fee award,[67] and, where the other *Johnson* factors favor an upward adjustment, such a reduction is potentially

---

[63] *See Johnson*, 488 U.S. at 714 (noting that the novelty and difficulty of the questions presented is a relevant consideration).
[64] 640 F.2d 663, 669 (5th Cir. 1981).
[65] *Hensley*, 461 U.S. at 436.
[66] *See Branch-Hines*, 939 F.2d at 1322; *Singer v. City of Waco, Tex.*, 324 F.3d 813, 829-30 (5th Cir. 2003).
[67] *See Migis*, 135 F.3d at 1048.

inappropriate.[68] In *Singer v. City of Waco, Texas*, plaintiffs only recovered $180,000 of the over $5,000,000 in damages sought. Nonetheless, the district court, rejecting a downward adjustment to account for plaintiffs' partial recovery, awarded plaintiff a fully compensatory fee.[69] The Fifth Circuit upheld the district court's fee award, emphasizing the novelty of the questions presented, the skill required to litigate the case, and counsel's experience and reputation.[70] Here, the novel questions presented and counsel's skill also militate against a reduction in the fee award. Further, in *Hensley*, the Supreme Court recognized that success on every claim is not a prerequisite for recovery of a complete fee:

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters.[71]

Here, Defendants, prevailing on the most significant issues litigated, obtained substantial monetary relief, in comparison to the scope of the litigation as a whole.

Third, Plaintiff's analysis of Defendants' success is overly narrow, focusing only on the monetary damages recovered. In *Coleman v. Houston Independent School District*, the Fifth Circuit endorsed a broader notion of success at trial than that advanced by Plaintiff: "while the amount of monetary damages recovered should be considered as one of the twelve *Johnson* factors, it should not be given determinative effect where the plaintiff has received other

---

[68] *See Singer*, 324 F.3d at 829-30.
[69] *Id.*
[70] *Id.*
[71] *Hensley*, 461 U.S. at 435 (internal citation omitted).

meaningful relief."[72] Here, Defendants obtained two legal determinations crucial to Leah's academic future: (1) that Leah was denied a free appropriate public education, and (2) that Leah's residential placement, including the numerous related services provided, were appropriate under the IDEA. Thus, Defendants' partial monetary recovery does not mandate a reduction in the fee award.

Viewing the scope of the litigation as a whole, the Court finds that Defendants achieved significant success. Thus, the *Johnson* factors do not warrant a downward adjustment of the lodestar, particularly in light of the other reductions.

*Hours Expended on Motion for Attorney's Fees and Motion Regarding Reimbursement*

Defendants also seek reimbursement for hours expended by counsel on Defendants' Motion for Attorney's Fees and Motion Regarding Reimbursement. Defendants did not specify the hours expended on these Motions. At the time Defendants filed their Motion for Attorney's Fees, the parties had not completed briefing on Defendants' Motion Regarding Reimbursement. Thus, Defendants could not specify the total hours expended on the Motion Regarding Reimbursement in their initial fee request. To avoid protracted and extended briefing on fees, the Court applies the *Johnson* factors to Plaintiff's claim for fees relating to the fee motion and Motion Regarding Reimbursement. The Court preliminarily concludes that a fee of **$5,000**, based on twenty-five hours at the rate of $200 per hour, represents a reasonable and necessary fee for such services. If either party objects to that preliminary determination, that party shall notify the Court by May 5, 2008. The Defendants may then file a brief of up to ten pages, and supporting evidence, by **May 19, 2008**. The Plaintiff may respond by June 6, 2008.

---

[72] 1999 WL 1131554 at *10; *see Singer*, 324 F.3d at 830 ("We have made clear that 'while a low damages award is one factor which a district court may consider in setting the amount of attorney's fees, this factor alone should not lead the district court to reduce  the lodestar.'") (quoting *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 392 (5th Cir. 2000)).

## CLERICAL AND OTHER COSTS

Neither party objected to Judge Ramirez's recommendation regarding recovery of clerical and other costs. Accordingly, Defendants may recover $1,168.20 in clerical costs, but are not entitled to reimbursement for $4,898.22 in other costs billed.

## CONCLUSION

Defendants are entitled to reimbursement of $**54,714.40** for Leah's private placement and related services, **$35,600** in attorney's fees, and **$1,168.20** in clerical costs, plus other attorney's fees to be determined.

**SO ORDERED**.

April 22, 2008.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**